| | | |
|---|---|---|
| JAMES BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 C 07833 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| MEGAN J. BRENNAN, Postmaster General | ) | |
| of the United States, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

James Bailey, a mail carrier at the Wood Dale Post Office, filed this lawsuit in October 2014 against the Postal Service, alleging race discrimination, gender discrimination, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*.[1] R. 1; R. 13.[2] Bailey, who is male and African-American, claims that since 2009, he has faced harsher discipline than those similarly situated to him of a different race or gender. *Id*. He also claims he was retaliated against for complaining of this alleged discrimination. *Id*. The Postal Service seeks summary judgment on all of Bailey's claims. R. 37. For the reasons discussed below, the Postal Service's motion is granted in part and denied in part.

## I. Background

In deciding the Postal Service's motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, Bailey.

---

[1]This Court has subject matter jurisdiction over the case under 28 U.S.C. § 1331.

[2]Citations to the docket are labeled as "R." followed by the docket number, and when necessary, the page and paragraph number.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Before summarizing the facts of this case, the Court first addresses two arguments raised by the Postal Service: (1) that Bailey's response to the Postal Service's statement of material facts violated Local Rule 56.1, and (2) that Bailey impermissibly attached the affidavit of Cecil Watson to his response to the Postal Service's statement of material facts. R. 50, Def.'s Reply Br. at 2-4.

### A. Local Rule 56.1

First, the Postal Service asserts that Bailey's response to its statement of material facts failed to comply with Local Rule 56.1. Def.'s Reply Br. at 2. Local Rule 56.1 governs motions for summary judgment in this District. It requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." L.R. 56.1(a)(3). The non-moving party is then required to respond to "each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B). The non-moving party must "admit or deny each factual statement proffered by the [moving party] and … designate with specificity and particularity those material facts believed to establish a genuine dispute for trial." *Greer v. Bd. of Educ. of the City of Chi., Ill.*, 267 F.3d 723, 727 (7th Cir. 2001). All uncontroverted material facts in the moving party's statement are deemed admitted. L.R. 56.1(b)(3)(C). If the non-moving party wishes to present additional facts, then it must do so in its own "statement, consisting of short numbered paragraphs" supported by citations to the

record. *Id.* Complying with Local Rule 56.1 is not a mere technicality. Indeed, the Rule takes on added importance in a case, like this one, with many events underlying the discrimination claims, an expansive volume of discovery, and an extensive factual back-and-forth; sorting through the myriad factual assertions would be extremely difficult without substantial adherence to Local Rule 56.1.

The Postal Service asserts that Bailey failed to comply with this Rule in several ways. First, in multiple instances, Bailey supposedly claims a fact is in dispute when he simply wishes to add additional information. Def.'s Reply Br. at 2. The Postal Service points to Bailey's responses to DSOF ¶¶ 10-13, 19, 22, 34, 41, 44, 47, 57-58, and 60.[3] *Id.* In one instance, the Postal Service is correct. In response to Paragraph 11, Bailey does not actually dispute any of the facts described in the Postal Service's statement, which relate to an incident that took place on September 1, 2009; rather, Bailey agrees to those facts and then adds new, unrelated facts about the hours he worked that day. Pl.'s Resp. to DSOF ¶ 11. Bailey's hours are not referenced in the Postal Service's statement. If Bailey wanted to add these additional facts, then he needed to do so in his own statement, not in his response to the Postal Service's statement.[4] L.R. 56.1(b)(3)(B) & (C); *Ammons v. Aramark*

[3]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for the Postal Service's Statement of Facts [R. 39], "PSOF" for Bailey's Statement of Facts [R. 48], "Pl.'s Resp. to DSOF" for Bailey's response to the Postal Service's Statement of Facts [R. 47], and "Def.'s Resp. to PSOF" for the Postal Service's response to Bailey's Statement of Facts [R. 51].

[4]Bailey likely sought to add these additional facts because his disciplinary notice related to this incident discusses events occurring after 10 a.m. R. 39, Exh. 8, 9/1/09 Notice of Suspension. But, according to Bailey, his timesheet for that day shows him clocking out before 10 a.m.; these are the facts Bailey seeks to add in his response. Pl.'s Resp. to DSOF

*Uniform Svcs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (noting that "several of [plaintiff's] responses … admit to the allegation but then add other additional facts[;] [t]hese facts should have been included in a separate statement"); *Johnson v. Cnty. of Cook*, 2012 WL 2905485, at *12 (N.D. Ill. July 16, 2012) ("It is inappropriate for a non-movant to include additional facts, meaning facts extraneous to the substance of the paragraph to which the non-movant is responding, in a Local Rule 56.1(b)(3)(B) response. Rather, Local Rule 56.1 *requires* … a litigant seeking to oppose a motion for summary judgment [to] file a response that contains a separate statement under Local Rule 56.1(b)(3)(C) … ." (citations and quotation marks omitted)). Paragraph 11 is deemed admitted.

In the other paragraphs, however, Bailey does seem to be genuinely disputing some of the facts contained in those paragraphs. For example, in Paragraph 10, the Postal Service states that "Bailey filed his initial complaint in this lawsuit on October 7, 2014, nearly a year after the final denial." DSOF ¶ 10. Bailey broadly denies this statement. Pl.'s Resp. to DSOF ¶ 10. But Bailey goes on to admit that he filed his complaint on October 7, 2014. *Id.* He then adds additional facts about the dates his EEOC appeals were decided. *Id.* Although the Postal Service asserts that Bailey agrees with the entirety of its statement, the additional dates Bailey provided do seem to dispute the latter part of the Postal Service's statement, namely, that Bailey filed his complaint in this case a year after the final denial. Sure, it would have been better for Bailey to admit to the date he filed this

---

¶ 11. But as already explained, if Bailey wanted to add these additional facts, the proper place to do so was in his own statement. L.R. 56.1(b)(3)(B) & (C).

complaint and then to dispute only the second half of the Postal Service's statement, but his response does not warrant automatic admission of the entirety of the Postal Service's statement.

The Court reaches a similar conclusion on the remaining paragraphs. To be sure, there are times where Bailey disputes some of the Postal Service's asserted facts in a particular paragraph, but then goes on to impermissibly add additional, unrelated facts in his response. *See* Pl.'s Resp. to DSOF ¶ 12 (last sentence challenging Postal Service's Exhibit 8); *id.* ¶ 13 (last two sentences related to Bailey's pay for September 1, 2009); *id.* ¶ 60 (last four sentences discussing discipline issued). In these instances, the Court disregards the additional facts, and takes into account only Bailey's actual challenge to the Postal Service's statement. *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008) (affirming the district court's refusal to consider additional facts included in the non-movant's Local Rule 56.1(b)(3)(B) response); *see also Eason v. Nolan*, 416 Fed. App'x 569, 569-70 (7th Cir. 2011); *Bolden v. Dart*, 2013 WL 3819638, at *2 (N.D. Ill. July 23, 2013).

The Postal Service next claims that several of Bailey's other responses violate Local Rule 56.1 by admitting to specific facts in a statement and then disputing facts not in the statement. Def.'s Reply Br. at 3. The Postal Service points to DSOF ¶¶ 14, 17, 20, 23, and 33. *Id.* These paragraphs are all similar. In all but one of the paragraphs, the Postal Service asserts that Bailey failed to apologize or to accept responsibility for certain conduct that resulted in Bailey receiving discipline. In his responses, Bailey admits that he did not apologize or accept responsibility, but he

then adds that he disputes the statement's intimation that he engaged in the allegedly improper conduct. *E.g.*, Pl.'s Resp. to DSOF ¶ 33 ("33. Bailey did not apologize or accept responsibility for leaving … mail in the wrong place[] … [Response]: Undisputed as to 'Bailey never apologized' and as to 'nor did he accept responsibility,' only. … Plaintiff disputes the intimation in Paragraph 33 that he was responsible for leaving mail in the wrong place, and denies the same."). The only paragraph that is slightly different is Paragraph 17, but there too Bailey challenges the statement's implied assertion. Pl.'s Resp. to DSOF ¶ 17. So, all of Bailey's responses are merely a denial of the unstated factual implications underlying the Postal Service's statements, and there is nothing wrong with laying down a cautious marker that Bailey disagrees with the unstated implications. These paragraphs are properly in dispute.

Next, the Postal Service argues that in certain instances Bailey purports to dispute facts related to what actually happened by adding statements about what *should* have happened. Def.'s Reply Br. at 3. The Postal Service points to DSOF ¶¶ 25, 27-28, 36-37, 48, and 69. *Id.* The Postal Service is correct. In each of Bailey's responses here, Bailey seeks to add additional facts about how a particular supervisor should have acted under the alleged circumstances. These additional facts are argumentative and improper in a Rule 56.1 statement. *De v. City of Chi.*, 912 F. Supp. 2d. 709, 713 (N.D. Ill. 2012) ("[A] Local rule 56.1(b)(3)(B) response [is] not the proper province of argumentative or conclusory allegations.") They will be disregarded. *Johnson v. Trans Union, LLC*, 2012 WL 983793, at *2 (N.D. Ill. March

22, 2012) ("'It is inappropriate to make legal arguments in a Rule 56.1 statement' or response." (quoting *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008))). The only slightly different response is to Paragraph 25; there Bailey also adds additional facts that he later uses to support his argument for why his supervisor acted improperly. Pl.'s Resp. to DSOF ¶ 25. Because this suffers from the same problems discussed previously, the Court will also disregard these argumentative statements and additional facts.

Finally, the Postal Service argues that Bailey violated Local Rule 56.1 in his response to DSOF ¶¶ 15 and 68 by claiming to dispute the facts alleged without citing to any evidence in the record. Def.'s Reply Br. at 3; L.R. 56.1(b)(3)(B). The Court agrees that Bailey fails to include a citation to any record evidence in his response to Paragraph 68, as required under Local Rule 56.1(b)(3)(B), so the Postal Service's statement in that paragraph is deemed admitted. *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005); *Smith v. Lamz*, 321 F.3d 680, 682-83 (7th Cir. 2003) ("[A] mere disagreement with the movant's asserted facts is inadequate [under Local Rule 56.1] if made without reference to specific supporting material."). But the Court disagrees that Bailey fell short in Paragraph 15. Although Bailey does not include any record citations in his response to that particular paragraph, he does refer specifically to certain of his prior responses. *See* Pl.'s Resp. to DSOF ¶ 15 (referring to "Plaintiff's Response in Paragraphs 11-14, herein"). In those prior responses, Bailey includes specific record citations. *Id.* ¶¶ 11-14. This response is acceptable.

## B. Cecil Watson Affidavit

The Postal Service also challenges Bailey's reliance on the affidavit of Cecil Watson, a former Postal Service supervisor. Def.'s Reply Br. at 4. Bailey attaches Watson's affidavit to his response to the Postal Service's statement of facts. *See* R. 47, Exh. C, Watson Aff. The affidavit does not, however, say anything specifically about the incidents at issue in this case. Instead, Watson's affidavit describes his understanding of several post office policies and procedures based on his experience as a supervisor. *See generally* Watson Aff. The problem is that the subject of Watson's potential testimony was too vaguely and too broadly disclosed by Bailey during discovery. First and foremost, Watson's testimony likely qualifies as expert testimony under Federal Rule of Evidence 702 (he is an expert based on his "experience"), which requires a disclosure under Rule 26(a)(2). At a minimum, Bailey should have provided "a summary of the facts and opinions to which [Watson] is expected to testify," Fed. R. Civ. P. 26(a)(2)(C)(ii), which he did not (at least there is nothing in the record saying that he did). Even if Watson should not be considered a Rule 702 expert, still Bailey did not sufficiently disclose the subjects of Watson's testimony. Specifically, in an interrogatory response, Bailey merely indicated that Watson had "knowledge of the facts" and "knowledge of Postal Policies and Regulations." R. 39, Exh. 44, Pl.'s Third Resp. to Def.'s Interrog. at 11. This is not a proper disclosure of the "subjects of [the] information" that the witness had under Rule 26(a)(1)(A)(i), which Bailey (and every litigant) has an ongoing duty to supplement during discovery. It would have been one thing if Bailey had

identified, even generally, what policies and regulations Watson had knowledge of, but Bailey did not do that. So the Postal Service was unfairly surprised by Watson's affidavit. Bailey did not front this issue in his response brief, nor did he seek a sur-reply to explain why reliance on Watson's affidavit was permissible after the Postal Service attacked it in the defense reply brief. Because Bailey failed to properly disclose his intended reliance on Watson, Watson's affidavit will be disregarded. With these issues now addressed, the Court turns to the facts.

### C. Bailey's Employment at the Wood Dale Post Office

James Bailey is an African-American male. DSOF ¶ 1.[5] From 1998 through November 2013, Bailey was employed by the Postal Service as a part-time flexible letter carrier (or, PTF-carrier for short) at the Wood Dale Post Office. DSOF ¶ 1; R. 39, Exh. 1, Bailey Dep. 10:12-11:24. In November 2013, Bailey was converted to a full-time letter carrier, a position he still holds today. DSOF ¶ 3; Bailey Dep. 11:17-24.

Part-time postal carriers are generally assigned to regular work schedules of less than forty hours per service week[6]; they must also be available to work flexible hours as assigned by the Postal Service. DSOF ¶ 2; Bailey Dep. 12:9-11 ("A part-time letter carrier is … only guaranteed two hours … ."); R. 39, Exh. 2, Union Contract at 007204. Full-time carriers, by contrast, are assigned to work schedules of at least five eight-hour days per service week. DSOF ¶ 3; Union Contract at 007204. *See also* Bailey Dep. 12:5-13 ("A. A full-time letter carrier is guaranteed 40

---

[5]Where a fact is admitted, only the asserting party's statement of facts is cited; where an assertion is otherwise challenged, it is so noted.

[6]A service week begins on Saturday and ends on Friday. PSOF ¶ 13.

hours. A part-time letter carrier is not[.]"). Part-time carriers can bid to temporarily hold-down a full-time assignment, which is vacant either because the regular carrier is "on leave or otherwise unavailable to work for five or more days." R. 47, Exh. B, The Joint Contract Administration Manual (JCAM) Art. 41.2B.3-B.5 at 008018 (listing "part-time flexible carriers" as a type of carrier that "may … opt for hold-down assignments"). If a PTF-carrier's bid is successful, and the carrier is assigned to a temporary, full-time, hold-down assignment, then that carrier is entitled to assume the full-time schedule for that assignment. Pl.'s Resp. to DSOF ¶ 2; JCAM Art. 41.2B.3-B.5 at 008024 ("Employees on hold-downs are entitled to work the regularly scheduled days and the daily hours of duty of the assignment[.] (emphasis in original omitted)); R. 47, Exh. A, Collins 2015 Dep. 116:16-117:5 ("[a] PTF … on the Hold-Down Assignment … [is] holding down assignments just like a regular would normally do"). In February 2011, Bailey was temporarily assigned to Carrier Route 4, a vacant full-time assignment. Pl.'s Suppl. Resp. to Def.'s Interrog. at 7; R. 47, Exh. D, Bailey Ltr. to Postmaster General at 007160; R. 48, Exh. 3, Collins 2012 EEO Dep. 10:3-5; Am. Compl. ¶ 10.

While working at the Wood Dale Post Office, and in particular, while working Carrier Route 4, Bailey was supervised by Kusum Puri and Marcus Collins. DSOF ¶¶ 7-8; R. 48, Exh. 3, Collins 2012 EEO Dep. 10:1-5; R. 39, Exh. 13, Puri 2011 EEO Aff. ¶ A7; Am. Compl. ¶ 12. Kusum Puri is female and of Asian descent. Puri 2011 EEO Aff. ¶¶ A3, A5. From May 2007 to November 2012, Puri worked as an "Officer in Charge and Supervisor of Customer Services." DSOF ¶ 7; R. 39, Exh. 4, Puri 2014

EEO Decl. ¶ 1. In November 2012, she became Postmaster of the Wood Dale Post Office. DSOF ¶ 7, Puri 2014 EEO Decl. ¶ 1. Collins is male and African-American. DSOF ¶ 8; R. 39, Exh. 5, Collins 2013 EEO Decl. ¶ 2. He has worked as a full-time letter carrier at the Wood Dale Post Office for 20 years. Collins 2013 EEO Decl. ¶ 1. From around 2005 or 2006 until 2013 or 2014, Collins held a temporary supervisory position: "Acting Supervisor of Customer Service." PSOF ¶ 33; DSOF ¶ 8; Collins 2013 EEO Decl. ¶ 1. While in that role, Collins was Bailey's immediate supervisor. Collins 2013 EEO Decl. ¶ 1. Both Collins and Puri have characterized Bailey as "a very good Carrier," and "the best carrier on this particular route [Route 4]." R. 48, Exh. 2, Collins 2011 EEO Aff. ¶ A12; Puri 2011 EEO Aff. ¶ A7 ("[Bailey] is a very good and productive Carrier on his route"); PSOF ¶ 3.

Yet, throughout his career, Bailey has been disciplined several times, which has included several "working suspensions." DSOF ¶ 4. This means the employee continues to work and to collect his usual pay during the term of suspension. *Id.*; Bailey Dep. 18:3-19:4; R. 48, Exh. 1, JCAM Art. 16.1 at 007907 ("Employees issued … suspensions of fourteen days or less will remain on duty during the term of the suspension with no loss of pay."). Working suspensions are still considered to be "of the same degree of seriousness" as time-off suspensions; they may also be considered in future disciplinary actions. *Id.*; R. 39, Exh. 8, 9/18/09 Notice of Suspension at 006032.

The Postal Service has certain policies to help guide a supervisor when issuing discipline. Article 16.1 of the Joint Contract Administration Manual[7] instructs supervisors to follow the "Just Cause Principle," which "requires a fair and provable justification for discipline." PSOF ¶ 2; JCAM Art. 16.1 at 007903. This provision outlines several basic factors for a supervisor to consider when issuing discipline, including whether there is a rule on point, whether that rule is reasonable and consistently enforced, whether a thorough investigation was completed, whether the severity of the discipline reasonably relates to the infraction and the employee's disciplinary record, and whether the discipline was issued in a timely manner. JCAM Art. 16.1 at 007903-7904; PSOF ¶ 2. Supervisors are also instructed to use, generally speaking, a progressive discipline system: "for most offenses[,] [supervisors] must issue discipline in a 'progressive' fashion, issuing lesser discipline (e.g., a letter of warning) for a first offense and a pattern of increasingly severe discipline for succeeding offenses (e.g., short suspension, long suspension, discharge)." JCAM Art. 16.1 at 007904.

If a carrier is disciplined, then that carrier may challenge the discipline by filing a grievance. PSOF ¶ 28; R. 47, Exh. I, Puri 2015 Dep. 17:8-11. During the first step of the grievance process, informal Step A, the supervisor who issued the discipline independently reviews the discipline and decides whether to reduce it.

_____

[7]The Joint Contract Administration Manual (JCAM) explains how the letter carriers' collective bargaining agreement should be applied. PSOF ¶ 1; R. 47, Exh. O, JCAM Cover & Preface. It also discusses how various disputes between the Postal Service and letter carriers have been resolved over time. PSOF ¶ 1; JCAM Cover & Preface. Supervisors must resolve any disputes discussed in the manual in accordance with the manual's guidance. PSOF ¶ 1; JCAM Cover & Preface at 007638.

PSOF ¶ 28; Puri 2015 Dep. 17:20-18:4. During the second step of the grievance process, Step B, the discipline is reviewed by the postmaster. PSOF ¶ 28; Puri 2015 Dep. 18:5-13. The postmaster meets with the letter carriers' union president, and then decides whether to keep the employee's discipline the same or reduce it. Puri 2015 Dep. 18:5-11. If the employee disagrees with the postmaster's decision, then the matter is sent to the Dispute Resolution Team. PSOF ¶ 29; Puri 2015 Dep. 19:24-20:13. The Dispute Resolution Team may choose to reduce or even to drop the discipline; it may also decide whether the discipline should stay in the employee's file and for how long. PSOF ¶ 29; Puri 2015 Dep. 20:14-21:7.

Every time Bailey has been disciplined by the Postal Service, he has filed a grievance. DSOF ¶ 6; Bailey Dep. 86:14-87:6. Since at least 2009, he has also filed a corresponding EEO complaint. DSOF ¶ 6; Bailey Dep. 86:25-87:10. Five of Bailey's EEO complaints, and the disciplinary actions discussed within them, are relevant to this case. DSOF ¶ 9.

### D. Bailey's EEO Complaints

### i. First EEO Complaint: Incident on September 1, 2009

In Bailey's first EEO complaint, EEOC docket no. 443-2010-00133X, which Bailey filed in December 2009, Bailey complained about an incident that took place on September 1, 2009, and the resulting discipline that he received. DSOF ¶ 9; R. 39, Exh. 6, 10/31/13 EEOC Denial of Mot. for Recons. of First EEO Compl. at 001468. When Bailey arrived at work on September 1, 2009, he noticed mail for a different route—Route 8—at his station. DSOF ¶ 11. Bailey approached Puri about

it. *Id.* ¶¶ 11-12; Pl.'s Resp. to DSOF ¶ 12. Puri told Bailey that he would need to deliver the Route 8 mail, which would take about 25 minutes, in addition to the mail for his own route. DSOF ¶ 11. Bailey told Puri that he would not be able to deliver all of this mail within eight hours. DSOF ¶ 12.

The parties dispute what happened next. According to Puri, she then told Bailey to work through lunch or to take overtime if necessary. *Id.*; R. 39, Exh. 8, 9/18/09 Notice of Suspension at 006032. But Bailey refused to deliver the Route 8 mail and repeatedly asked Puri, "What are your instructions?" DSOF ¶ 12; 9/18/09 Notice of Suspension at 006032. Because Bailey's tone during this exchange was loud, rude, and disruptive to the workroom floor, Puri asked Bailey to leave. DSOF ¶¶ 12-13; 9/18/09 Notice of Suspension at 006032.

According to Bailey, after he told Puri that he would not be able to deliver all the mail without going into overtime, he simply asked her what her instructions were. Pl.'s Resp. to DSOF ¶ 12; R. 39, Exh. 7, 1/08/10 Step B Decision at 000089. Puri then began yelling at Bailey, telling him that he could perform the assignment in eight hours. Pl.'s Resp. to DSOF ¶ 12; 1/08/10 Step B Decision at 000089. Bailey asked her to stop yelling; Puri became angry and told Bailey to clock out for the day. Pl.'s Resp. to DSOF ¶ 12; 1/08/10 Step B Decision at 000089.

Both parties agree that following this incident, on September 18, 2009, Puri issued Bailey a 14-day suspension for conduct unbecoming a postal employee. DSOF ¶ 15; 9/18/09 Notice of Suspension. That suspension was later (in January 2010) reduced to a letter of warning by the Dispute Resolution Team. DSOF ¶ 16; 1/08/10

Step B Decision at 000088. Bailey was ultimately paid for the hours of work he missed on September 1 after being sent home by Puri. DSOF ¶ 13; Pl.'s Resp. to DSOF ¶ 13; 1/08/10 Step B Decision at 000090.

In his EEO complaint, Bailey asserted that the Postal Service discriminated against him on account of his race (African-American) and sex (male), and in reprisal for prior protected EEO activity when Puri sent him home on September 1, 2009, placed him in an off-duty status without pay for the day, and issued him a 14-day suspension. 10/31/13 EEOC Denial of Mot. for Recons. of First EEO Compl. at 001468. After an investigation, Bailey requested a hearing before an EEOC administrative judge. *Id.* That hearing request was dismissed, and the Postal Service issued a final decision on the record finding no discrimination. *Id.* In October 2013, Bailey's final request for reconsideration was denied, and Bailey was told he had 90 calendar days within which to file a civil action in a United States District Court. *Id.* at 001469.

### ii. Second EEO Complaint: Incidents on June 30, August 4, and August 25, 2011

Bailey filed his second EEO complaint, EEOC docket no. 440-2012-00068X, in November 2011. DSOF ¶ 18; R. 39, Exh. 10, 8/21/14 EEOC Decision on Second EEO Compl. at 001837. Here, Bailey complained about discipline he received in 2011 on June 30 and August 4, as well as an incident that occurred on August 25, 2011. DSOF ¶ 18; 8/21/14 EEOC Decision on Second EEO Compl. On June 30, 2011, Puri issued Bailey a letter of warning for failing to perform his duties as assigned after a clerk found some of Bailey's deliverable mail in an empty tray on a skid that was to

be returned to the plant and discarded. DSOF ¶ 19; R. 39, Exh. 11, 6/30/11 Ltr. of Warning at 000258; R. 39, Exh. 12, Puri 2012 EEO Dep. 8:20-9:17. Bailey denies leaving any deliverable mail in an empty tray. Pl.'s Resp. to DSOF ¶ 19. Puri admits that neither she, nor the distribution clerk who discovered the mail, saw Bailey place it there. Puri 2012 EEO Dep. 9:3-11. Puri's letter of warning was later reduced to a job discussion by the Dispute Resolution Team. DSOF ¶ 21; R. 39, Exh. 15, 11/22/11 Step B Decision at 000323-324.

On August 4, 2011, Collins issued Bailey a seven-day suspension for failing to perform his duties as assigned after a clerk found first-class mail in Bailey's undeliverable bulk business mail (or, UBBM) bin.[8] DSOF ¶ 22; R. 39, Exh. 16, 8/04/11 Notice of Suspension at 000256; R. 39, Exh. 17, Collins 2012 EEO Dep. 13:19-14:13. Bailey disputes that he left any mail behind. Pl.'s Resp. to DSOF ¶ 22. The Postal Service admits that no one saw Bailey put any mail in his UBBM bin. Def.'s Resp. to PSOF ¶ 6. When questioned about this incident by Collins, Bailey continually responded, "I do my job to the best of my ability." DSOF ¶ 23; 8/04/11 Notice of Suspension at 000256. Bailey's seven-day suspension was again reduced by the Dispute Resolution Team, this time to a letter of warning. DSOF ¶ 24; R. 39, Exh. 19, 11/21/11 Step B Decision at 000330.

The incident on August 25, 2011 related to the number of hours Bailey was allowed to work that day. Bailey complained that he was allowed to work only 5.15 hours, while PTF-carrier LaTanya Rogers (female and African-American), and

---

[8]Undeliverable bulk business mail, or UBBM, "is mail that cannot be delivered and cannot be forwarded. UBBM is mail that can be disposed of as waste." R. 39, Exh. 25, Puri 2013 EEO Decl. ¶ 5.

transitional employees Rafael Barszczewski (male and Caucasian) and Debra Stewart (female and African-American) were allowed to work longer hours. DSOF ¶¶ 25-26; R. 39, Exh. 20, Hours Analysis at 000339; R. 39, Exh. 42, 10/23/14 Final Agency Decision at 002334; Pl.'s Third Resp. to Def.'s Interrog. at 4-5 (¶ 8). On August 25, Rogers worked 8.98 hours, Barszczewski worked 8.25 hours, and Stewart worked 8.00 hours. Pl.'s Resp. to DSOF ¶ 25; R. 39, Exh. 20, Hours Analysis at 000339, 000342.

According to Puri, mail was "very light" that day, so she needed to take work from a PTF-carrier to ensure that the full-time carriers could work their full eight-hour days. DSOF ¶ 25; Puri 2011 EEO Aff. ¶ A24. She decided to split Bailey's route, rather than another PTF-carrier's route (like Rogers'), because it was "more efficient" and would help even-out the weekly hours between Bailey and Rogers. Puri 2011 EEO Aff. ¶¶ A24-A25; Puri 2012 EEO Dep. 43:20-45:14. Puri stated that she tries to equalize PTF work hours in accordance with a verbal agreement she has with the letter carriers' union steward in the Wood Dale Post Office. Puri 2011 EEO Aff. ¶ A25; Puri 2012 EEO Dep. 46:21-24. She also stated that Bailey agreed to give up part of his route that day: "I asked PTF Bailey if he would give up part of his route and when he agreed, I asked him how many hours work would he agree to give up. He replied 3 hours." Puri 2011 EEO Aff. ¶ A24; Puri 2012 EEO Dep. 45:1-8 ("Q. Mr. Bailey agreed [to give up part of his route]? A. That's right.").

At that time, Bailey was still assigned to Route 4, his temporary full-time, hold-down assignment. Collins 2012 EEO Dep. 34:7-9. Rogers, by contrast, was not

on a bid assignment. *Id.* 34:17-19 ("Q. And Miss Rogers was not on a bid assignment for that day, correct? A. Correct."). A PTF-carrier on a hold-down assignment (like Bailey was at the time) is generally considered to have priority over both a non-hold-down PTF-carrier and transitional employees. Collins 2015 Dep. 41:6-15 ("[Q.] Is it fair to say that a PTF, a T.E. [transitional employee], and a causal, … there is no priority over who is entitled to more hours? A. What I would say out of those three people, I would base it off of that the PTF would probably be a little bit more superior than a T.E. or a causal … ."); *id.* 117:11–118:3 ("Q. Do … PTFs with Hold-Down Assignments come before PTFs without [them] … ? A. I would say that they do, because they actually hold-down the assignment. … Q. So if there was overtime available, … [o]bviously the full-time carrier gets priority in the overtime hours … ? A. Yes. Q. Okay. And the PTF [with] … the Hold-Down Assignment would have priority over the PTF that doesn't … is that right? A. I would say so, yes, because that PTF is holding down an assignment … ."); Puri 2015 Dep. 22:9-21 ("[Q]. Are the PTFs ranked for any purposes by seniority? A. When time comes for conversion, yes, the senior person gets converted first. Q. Okay. But other than conversion … ? A. No. Q. What if a PTF has a Hold-Down Assignment, does the … hold-down PTF carrier have priority over a non-hold-down PTF carrier? A. Yes."); *id.* 69:5-8 ("Q. Can work be taken from a PTF on a Hold-Down Assignment and given to PTFs who were not on Hold-Down Assignments? A. No.").

It is also undisputed that there is no specific written post office policy requiring hours to be equalized among PTF-carriers. Puri 2012 EEO Dep. 47:1-6 (Q.

Okay. Let me ask you. According to postal contract, are you required to equalize --
A. No. Q. -- PTF hours? A. No, no."); Collins 2012 EEO Dep. 39:4-7 ("Q. … [I]s there
a contract regulation that states you have to equalize PTF work hours? A. I don't
recall … "). However, it does appear to be an adopted practice in the Wood Dale Post
Office. *Id.* 39:10-15 ("A. … I don't recall. But I believe that it is fair that all PTFs get
the equal share of hours. We have a verbal agreement between the union and
management in our office. … So that's what I've always known … "); Puri 2012 EEO
Dep. 46:21-24 ("Q. Are you required to equalize PTF work hours? A. It's our verbal
agreement with the union steward in Wood Dale office.").

Pointing to these three incidents, Bailey alleged in his second EEO complaint
that he was subjected to harassment and a hostile work environment on account of
his race and sex, and in reprisal for prior EEO activity. 8/21/14 EEOC Decision on
Second EEO Compl. at 001837-1838. Bailey again requested a hearing before an
EEOC Administrative Judge. *Id.* at 001838. The Postal Service sought a decision
without a hearing. *Id.* On November 25, 2013, the administrative judge issued a
summary judgment decision in favor of the Postal Service finding no discrimination.
*Id.* The judge concluded that Bailey had "[failed to] show by a preponderance of the
evidence that he was discriminated against on the bases of race, sex and reprisal
discrimination," or that "the [Postal Service's] proffered reasons for its actions were
a pretext for discrimination." *Id.* The Postal Service implemented the
administrative judge's decision in its final action. *Id.* Bailey appealed, but the
Postal Service's decision was affirmed on August 18, 2014. *Id.* at 001837-1841.

### iii. Third EEO Complaint: Incidents on August 9, September 25, and October 23, 2012

In his third EEO complaint, EEOC docket no. 440-2013-00077X, Bailey contested discipline he received on August 9, 2012, and October 23, 2012, as well as an incident that occurred on September 25, 2012. DSOF ¶ 31. On August 9, 2012, Collins issued Bailey a seven-day suspension after deliverable mail was again found in Bailey's UBBM bin on three separate occasions. R. 47, Exh. K, 8/09/12 Notice of Suspension; R. 39, Exh. 24, Collins 2013 EEO Decl. ¶¶ 5-10; Puri 2013 EEO Decl. ¶¶ 9-11. Before issuing the suspension, on July 26, 2012, Collins tried to hold a pre-disciplinary interview with Bailey, but because Bailey requested union representation, the meeting was pushed to a later date. DSOF ¶ 33; Pl.'s Resp. to DSOF ¶ 33; 8/09/12 Notice of Suspension at 000530; R. 39, Exh. 27, Bailey 2013 EEO Dep. 30:16-31:4. The parties agree that on July 26, when Bailey was instructed to go to the Postmaster's office, Bailey asked, "Is it discipline?" 8/09/12 Notice of Suspension at 000530; Collins 2013 EEO Decl. ¶ 8; Bailey 2013 EEO Dep. 30:19-24. The parties dispute what happened next. According to Collins, when Bailey was told that it could lead to discipline, he tried to clock out; when he was told he could be charged with failing to follow instructions if he left, Bailey started yelling. Collins 2013 EEO Decl. ¶ 8; 8/09/12 Notice of Suspension at 000530. Bailey was then instructed to leave. *Id.* According to Bailey, it was Collins who got upset. Bailey 2013 EEO Dep. 31:1-13. Bailey also disputes whether he left mail in his UBBM tub on the dates alleged. Pl.'s Resp. to DSOF ¶ 33. Again, the Postal Service admits no one saw Bailey put the mail in his UBBM bin. Def.'s Resp. to PSOF ¶ 6.

The incident on September 25, 2012 related to an attempt by Bailey to take eight hours of sick leave, a request that was ultimately denied. DSOF ¶ 34. Bailey was scheduled to work both Monday, September 24, 2012 and Tuesday, September 25, 2012. Puri 2013 EEO Decl. ¶ 13. On September 24, he was to work his regular Route 4 shift. *Id.*; Pl.'s Resp. to DSOF ¶ 34. On September 25, which was a non-scheduled day for Route 4 (meaning he was not required to work his route that day), Bailey was still scheduled to work, but on some other PTF-carrier assignment. Puri 2013 EEO Decl. ¶ 13; R. 39, Exh. 26, Puri 2013 EEO Dep. 40:22-41:16. On Monday September 24, Bailey called in sick and requested sixteen hours of sick leave for Monday September 24 and Tuesday September 25. R. 47, Exh. E., Bailey 2015 Aff. ¶ 9; Puri 2013 EEO Dep. 40:22-41:1. Bailey's request for eight hours on September 25 was denied. DSOF ¶ 34; Puri 2013 EEO Dep. 41:5-7. According to Puri, Bailey's request was denied because it was a non-scheduled day for him on Route 4 and he was already scheduled to work forty hours that week. *Id.* 41:8-16. The Postal Service's Employee and Labor Relations Manual limits a PTF-carrier's ability to request sick leave depending on a PTF-carrier's hours in a given week. R. 39, Exh. 29, Employee Manual at 007787. It provides that "part-time flexible employees who have been credited with 40 hours or more of paid service (work, leave, or a combination of work and leave) in a service week are not granted sick leave during the remainder of that service week." *Id.* (Section 513.421(c)). Puri interpreted this section as prohibiting Bailey from being paid sick leave for his non-scheduled day (September 25) because he was already scheduled to work (and to be paid for) at

least forty hours that week. DSOF ¶ 36; Puri 2013 EEO Decl. ¶ 13; Puri 2013 EEO Dep. 41:8-16. Indeed, excluding the requested sick leave on September 25, Bailey was paid for 42.94 hours of work that week (September 22-28, 2012). DSOF ¶ 35.

The last instance of discipline Bailey cited in this EEO complaint occurred on October 23, 2012. On that day, Collins issued Bailey a 14-day suspension for failing to maintain a regular work schedule after Bailey had three unscheduled absences within a three-month period. R. 39, Exh. 30, 10/23/12 Notice of Suspension. Bailey did not submit doctors' notes for any of those absences. DSOF ¶ 38. He was not, however, strictly required to provide this documentation. For absences of three days or less, supervisors may accept the employee's statement explaining the absence. PSOF ¶ 12; R. 48, Exh. 5, Employee and Labor Relations Manual at 003032. This policy of disciplining carriers for three unscheduled absences in a three-month period is not a nationwide policy, but there is evidence to suggest that it is a local policy at the Wood Dale Post Office. PSOF ¶ 17; R. 47, Exh. P, Def.'s Second Resp. to Pl.'s First Set of Interrog. at 002373-2374 (¶ 25); Puri 2015 Dep. 33:22-34:9.

Bailey's third EEO complaint was unsuccessful. In June 2014, an EEOC administrative judge determined that Bailey had not shown that he was the victim of illegal discrimination. R. 39, Exh. 22, 7/02/14 Notice of Final Action Related to Third EEO Compl. at 003908; R. 39, Exh. 31, 6/20/14 EEOC AJ Summ. J. Op. In July 2014, the Postal Service issued a final agency action implementing the decision

of the administrative judge.[9] 7/02/14 Notice of Final Action Related to Third EEO Compl.

### iv. Fourth EEO Complaint: Incidents on February 16 and April 2, 2013

In Bailey's fourth EEO complaint, EEOC docket no. 440-2013-00216X, Bailey complained about discipline he received on February 16, 2013, and April 2, 2013. DSOF ¶ 39. On February 16, 2013, Collins issued Bailey a 14-day suspension for failing to perform his duties as assigned, and more specifically, for the unauthorized disposal of mail. R. 39, Exh. 35, 2/16/13 Notice of Suspension. This discipline was issued after two pieces of first-class mail were found in Bailey's UBBM bin on December 8, 2012. *Id.*; R. 39, Exh. 33, Photocopy of Mail. Originally, Collins issued Bailey a notice of removal for this incident on December 22, 2012. R. 39, Exh. 32, 12/22/12 Notice of Removal; DSOF ¶ 40. But that notice was later rescinded due to a typographical error in the discipline. R. 39, Exh. 34, 2/08/13 Rescission of Notice of Removal. Bailey was then issued a 14-day suspension. 2/16/13 Notice of Suspension. Bailey denies leaving mail in his UBBM bin. Pl.'s Resp. to DSOF ¶ 40.

On April 2, 2013, Collins issued Bailey a notice of removal for failing to perform his duties as assigned after Bailey delivered a certified flat-mail piece on March 19, 2013, without obtaining the recipient's signature. R. 39, Exh. 37, 4/02/13

---

[9]The parties both state that the Postal Service issued its final agency decision on June 20, 2014. *See* DSOF ¶ 31; Pl.'s Resp. to DSOF ¶ 31. But a review of the exhibit they cite—the notice of final action, R. 39, Exh. 22, 7/02/14 Notice of Final Action Related to Third EEO Compl.—suggests that this is incorrect. That notice is dated July 2, 2014, and stamped as received by the Postal Service's Law Department on July 9, 2014. *Id.* at 003908-3909. In the body of the notice, it states that an administrative judge with the EEOC issued a decision on June 20, 2014, which was received by the Postal Service on June 30, 2014. *Id.* at 003908. So it cannot be that this notice was also issued on June 20, 2014. But the date is not really important.

Notice of Removal. Puri learned about this incident after a customer called to complain; she then shared the information with Collins. R. 39, Exh. 40, Puri 2014 Second EEO Decl. ¶ 6. R. 39, Exh. 41, Collins 2014 EEO Decl. ¶ 6. Bailey denies delivering any certified mail on March 19, 2013. Pl.'s Resp. to DSOF ¶¶ 43-45. Bailey points to a log sheet which does not show any certified mail for his route on March 19. *Id.* ¶ 44; R. 47, Exh. R, 3/19/13 Accountable Log Sheet. Bailey's notice of removal for this incident was reduced by the Dispute Resolution Team to a 14-day suspension, which was combined with the 14-day suspension Bailey received for the incident on February 16 (mail found in his UBBM bin) into one 14-day suspension. R. 39, Exh. 36, 7/19/13 Step B Decision at 000895 ("[T]he DRT agreed that the Notice of Removal dated 04/02/13 and the 14-Day Suspension dated 02/16/13 will be combined into one 14-Day Suspension to remain in the grievant's file[.]").

In the same opinion addressing Bailey's third EEO complaint, the administrative judge also addressed Bailey's fourth complaint. 6/20/14 EEOC AJ Summ. J. Op. The administrative judge again found that Bailey had not shown that he was discriminated against, and found that summary judgment in favor of the Postal Service was proper. *Id.* at 003905-3907.

### v. Fifth EEO Complaint: Inability to Start Work Earlier and Delay in Conversion to Full-time Carrier

In his fifth and final EEO complaint, EEOC docket no. 440-2014-00065X, Bailey complained about being denied the opportunity to start work thirty minutes earlier—at 7:00 a.m. rather than 7:30 a.m.—like two other PTF-carriers: Rosa Villareal (female and Hispanic) and LaTanya Rogers (female and African-

American). DSOF ¶ 46; Pl.'s Resp. to DSOF ¶ 46; R. 39, Exh. 42, 10/23/14 Final Agency Decision at 002334. Bailey asserted that at least for Rogers, this resulted in her receiving more overtime wages. Pl.'s Resp. to DSOF ¶ 47; R. 39, Exh. 47, Pl.'s Suppl. Discovery Resp. Ltr. at 2; 10/23/14 Final Agency Decision at 002330-2231. Puri states that she assigned Rogers an earlier start time so that Rogers, who was a PTF-carrier at the time, could case mail on open routes;[10] this enabled Puri to avoid calling a carrier to work on his or her non-scheduled day at the overtime rate. Puri 2014 EEO Decl. ¶ 12. Puri further states that she assigned Rogers an earlier start time so that Puri could run the office in a more efficient manner and avoid paying unnecessary overtime. *Id.*

In addition, Bailey complained about the amount of time it took the Postal Service to convert him from a PTF-carrier to a full-time carrier. DSOF ¶ 46. Bailey was converted to a full-time carrier in November 2013. DSOF ¶ 49. He claims he should have been converted earlier—in January 2013—when Rosa Villareal was converted to a "T6" swing position, which is a full-time carrier position. Pl.'s Third Resp. to Def.'s Interrog. at 9; PSOF ¶ 18. According to Puri, at the time Villareal was converted, there was a nationwide mandate in effect that precluded PTF-

---

[10]Neither party defines what it means to "case mail." But it would appear it means to manually sort letters into some sort of sequence or designated cases (such as into delivery sequence). *See* United States Postal Service, Publication 32 – Glossary of Postal Terms, available at http://about.usps.com/publications/pub32/pub32_terms.htm (last visited August 26, 2016) (defining "case" as follows: "(1) A piece of equipment that contains labeled separations into which clerks or carriers manually sort letters, flats, or irregular parcels. Cases are designed to allow flexible configuration of the separations, and they can be expanded by attaching additional cases (wing cases) on either side. (2) To sort mail into a case. To place letter and flat mail into the separations of a carrier case. (3) To place flat mail in delivery sequence outside a case using the delivery order shown for the letter mail.")

carriers from filling any vacant full-time positions other than T6 swing positions. PSOF ¶¶ 19, 21. Because Villareal was senior to Bailey, it was appropriate for her to be converted first. DSOF ¶ 53 ("Under the Postal Service's union contract, PTFs must be converted to full-time carriers in order of their seniority."); Union Contract at 007246-7247; R. 39, Exh. 45, Seniority List (listing Villareal before Bailey).

Bailey does not contest that it was appropriate for Villareal to be converted first. But he asserts that there were two full-time vacancies in January 2013: Carrier Route 4 and a T6 swing position. PSOF ¶ 22; Bailey Dep. 76:24-77:7. Bailey contends that Dannie Mamparo's T6 swing position should have also been available because Mamparo had been on medical leave for over a year at that point. PSOF ¶¶ 22-23. The Postal Service disputes this fact. Def.'s Resp. to PSOF ¶ 22. According to the Postal Service, in January 2013, only the Route 4 position was available.[11] *Id.* Villareal bid on that position, which she was awarded, and then when a T6 swing position became available later in 2013, Villareal dropped the Route 4 position and bid on the T6 swing position. *Id.* After Villareal left the Route 4 position, it was posted in September 2013.[12] *Id. See also* R. 48, Exh. 9, Puri 11/05/13 Aff. at 001082.

Bailey's fifth EEO complaint again fell short. On October 23, 2014, the Postal Service issued a final agency decision concluding that Bailey had failed to establish

---

[11]The parties do not discuss how long Bailey's hold-down assignment for Route 4 lasted. But there is evidence suggesting that Bailey held the assignment until July 2013. Pl.'s Third Resp. to Def.'s Interrog. at 7.

[12]The Postal Service's position on these facts is somewhat inconsistent. The facts discussed here were taken from the Postal Service's Response to Paragraph 22 of Bailey's Local Rule 56.1 statement. But in its response to an earlier paragraph, the Postal Service agreed that Villareal was converted to a T6 swing in January 2013. Def.'s Resp. to PSOF ¶ 18. It is possible that these responses could be reconciled if the Route 4 position is also a T6 swing. But it is not clear.

through these two incidents that he was discriminated against on account of his race or gender, or in retaliation for EEO activity. R. 39, Exh. 42, 10/23/14 Final Agency Decision on Fifth EEO Compl.

### E. This Lawsuit

Bailey filed this lawsuit on October 7, 2014, alleging that the Postal Service discriminated against him on account of his race (African American) and gender (male) (Counts 1 and 2), and that the Postal Service retaliated against him for filing these EEO complaints (Count 3). R. 1; R. 13. The Postal Service now moves for summary judgment on all of Bailey's claims. R. 37, Def.'s Mot. Summ. J.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no

genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

In his amended complaint, Bailey raises three claims: discrimination based on race in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1) (Count 1); discrimination based on sex, also in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1) (Count 2); and retaliation in violation of Title VII, 42 U.S.C. § 2000e-3(a) (Count 3). R. 13, Am. Compl. In addition, Bailey now appears to be asserting, for the first time, a hostile work environment claim. R. 46, Pl.'s Resp. Br. at 6.

### A. Hostile Work Environment Claim

The Court first addresses Bailey's hostile work environment claim, which was not asserted in his amended complaint. *See* Am. Compl. The first time Bailey mentions this claim is in his response to the Postal Service's motion for summary judgment. *Id.* ("Defendant … ignores Plaintiff's claims that the totality of the baseless actions against him amounted to a hostile work environment."). But Bailey's attempt to add this hostile work environment claim comes far too late.

Bailey already amended his complaint once on January 15, 2015, without mentioning any hostile work environment claim. R. 13, Am. Compl. On February 18, 2015, the Court set a Rule 16(b) deadline to add parties or amend the pleadings

of June 1, 2015. R. 15, 2/18/15 Minute Entry. Over a year has passed since that deadline, and up until now, Bailey had still made no mention of wanting to add a hostile work environment claim to his complaint. While Rule 15 instructs that leave to amend the pleadings should be "freely give[n] … when justice so requires," Fed. R. Civ. P. 15(a)(2), this right is not absolute. *See Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 666 (7th Cir. 2007); *Brunt v. Serv. Emps. Int'l Union*, 284 F.3d 715, 720 (7th Cir. 2002). And Rule 15(a)(2) must be read in conjunction with Rule 16. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 719 (7th Cir. 2011); Fed. R. Civ. P. 16. Once a court enters a scheduling order under Rule 16, as the Court did here in February 2015, any subsequent requests to amend the pleadings after that deadline must satisfy both Rule 16(b)(4)'s "good cause" requirement, as well as Rule 15(a)(2)'s standard. *Alioto*, 651 F.3d at 719; *Kortum v. Raffles Holdings, Ltd.*, 2002 WL 31455994, at *3 (N.D. Ill. Oct. 30, 2002) ("When [an amendment] request would require alteration to a Rule 16(b) scheduling order … , the moving party must overcome the presumption against modification through 'a showing of good cause.'" (quoting Fed. R. Civ. P. 16(b))).

In this case, Bailey has not only failed to show good cause for his delay in seeking this amendment, but he has also failed to even ask for leave to amend his complaint, which is the only way he can add a claim at this point. Fed. R. Civ. P. 15(a). Instead, he tries to insert this new claim into his summary judgment briefing without any explanation. Pl.'s Resp. Br. at 6. "It is well settled that a plaintiff may not advance a new argument in response to a summary judgment motion."

*Abuelyaman v. Ill. St. Univ.*, 667 F.3d 800, 814 (7th Cir. 2011) (citing *Andree v. Ashland Cnty.*, 818 F.2d 1306, 1314 n.11 (7th Cir. 1987)). Bailey's attempt to do so here fails. The Postal Service is entitled to summary judgment on Bailey's hostile work environment claim.

## B. Discrimination Claims

Bailey next asserts that the Postal Service discriminated against him on account of his race (African-American) and gender (male) in violation of Title VII. Am. Compl. ¶¶ 61-72. To prevail on a Title VII discrimination claim, a plaintiff must show that "the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, — F.3d —, 2016 WL 4411434, at *4 (7th Cir. Aug. 19, 2016). The Seventh Circuit has dispensed with the "direct" and "indirect" frameworks for analyzing employment discrimination claims, *id.*, which had taken on a life of their own, sowing confusion and sometimes imposing a too-high burden on plaintiffs. But the prima facie framework under *McDonnell Douglas* of course survives (it was established by the Supreme Court). *Id.* at *5. Under the prima facie framework, a plaintiff must show that: (1) he belongs to a protected class; (2) he performed his job to the defendant's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of his protected class were treated more favorably by the defendant. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973); *Atanus v. Perry*, 520 F.3d 662, 672-73 (7th Cir. 2008); *Wyninger v. New*

*Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004). If the plaintiff is able make a prima facie case, then the burden shifts to the defendant "to produce a legitimate, noninvidious reason for its actions." *Atanus*, 520 F.3d at 672. If the defendant successfully rebuts the plaintiff's prima facie case, then the burden shifts back to the plaintiff "to show that the [defendant's] reasons 'are false and only a pretext for discrimination.'" *Id.* (quoting *Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1290 (7th Cir. 1997)).

In arguing against summary judgment, Bailey relies solely on the *McDonnell Douglas* framework. The Postal Service asserts that in each instance of alleged discrimination, Bailey fails to show that he suffered an adverse employment action or that similarly situated employees outside his protected class were treated more favorably (or both). Def.'s Br. at 9. The Postal Service also asserts that it had a legitimate, non-discriminatory reason for all of its action. *Id.* at 18-19. Bailey alleges eleven discrete incidents of discrimination. The Court reviews each in turn.

### 1. September 1, 2009 Incident

Bailey first asserts that he was discriminated against on September 1, 2009, when Puri sent him home after he refused to deliver auxiliary Route 8 mail and disrupted the workroom floor. Am. Compl. ¶¶ 13-15; DSOF ¶¶ 9, 12-13. Puri originally issued Bailey a 14-day suspension for this incident, but that suspension was reduced to a letter of warning. DSOF ¶¶ 15-16; 9/18/09 Notice of Suspension; 1/08/10 Step B Decision. Bailey was ultimately paid for a full day of work on September 1, 2009. DSOF ¶ 13; 1/08/10 Step B Decision at 000090.

The Postal Service asserts that Bailey's claim here is untimely, Def.'s Br. at 7, and the Postal Service is correct. Bailey filed his EEO complaint for this incident on December 7, 2009. 10/31/13 EEOC Denial of Mot. for Recons. of First EEO Compl. at 001468. His final reconsideration request was denied on October 31, 2013. *Id.* at 001469. At that time, Bailey was informed that he had 90 calendar days to file a civil action. *Id.* ("You have the right to file a civil action in an appropriate United States District Court within ninety (90) calendar days from the date that you receive this decision."); *Threadgill v. Moore U.S.A., Inc.*, 269 F.3d 848, 849-50 (7th Cir. 2001) ("A civil action alleging a Title VII violation must be filed within 90 days of receiving a right-to-sue notice from the EEOC."); 42 U.S.C. § 2000e-5(f)(1). But Bailey did not file his complaint in this action until October 7, 2014, almost one year later. R. 1. Bailey's only response to this timing issue is that hostile work environment claims do not require all prior acts to occur within the statutory time period, they only require one act to fall within that time period. Pl.'s Resp. Br. at 8. But while this might be true, *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116-17 (2002), as already discussed above, Bailey never sought leave to add a hostile work environment claim, so that claim has not been properly asserted and cannot be relied upon to save his claim here. Because Bailey failed to file his discrimination claim related to this September 2009 incident within the statutorily imposed limitations period, this particular claim is untimely.

Even if it were timely, Bailey also fails to show that he suffered an adverse employment action. "An adverse employment action is one that significantly alters

the terms and conditions of the employee's job." *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004). It "must be materially adverse, not merely an inconvenience or a change in job responsibilities." *Id.* At the very least, a plaintiff "'must show some quantitative or qualitative change in the terms or conditions of his employment or some sort of real harm.'" *Chaib v. Ind.*, 744 F.3d 974, 982 (7th Cir. 2014) (quoting *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1116-17 (7th Cir. 2009)); *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). For instance, a "materially adverse change" may include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993).

In this incident, the only discipline Bailey actually faced was a letter of warning; the original suspension was reduced by the Dispute Resolution Team. 1/08/10 Step B Decision at 000088. But the Seventh Circuit has said that "a letter of reprimand is not an adverse employment action unless the letter is accompanied by some other action, such as job loss or demotion." *Krause v. City of LaCrosse*, 246 F.3d 995, 1000 (7th Cir. 2001) (emphasis omitted; discussing requirement in retaliation context); *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001) (noting that "oral or written reprimands" do not "implicat[e] ... 'tangible job consequences'" that provide "an independent basis of liability under Title VII" in

discrimination context)[13]; *see also Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005). This remains the case even under a progressive discipline system like the one used by the Postal Service. *Oest*, 240 F.3d at 613 ("Nor do we believe that the … reprimands received by Ms. Oest *under the Department's progressive discipline system* [were] … sufficient[] … to constitute an independent basis of liability under Title VII." (emphasis added)). Because Bailey has not pointed to any tangible job consequences resulting from his letter of warning, Bailey has failed to show he suffered an adverse employment action. The only potential tangible job consequence Bailey faced as a result of this incident was lost wages from being sent home early. *Whittaker*, 424 F.3d at 647-48 (adverse job action may include "loss or reduction of pay"). But Bailey does not dispute that he ultimately received a full day's pay for September 1, 2009, pursuant to the Dispute Resolution Team's decision. DSOF ¶ 13; 1/08/10 Step B Decision at 000090. And while there was likely a lag between when Bailey should have received his pay for that day and when he ultimately received it, Bailey does not allege any sort of tangible hardship resulting from this delay. So this is another reason, aside from untimeliness, to grant summary judgment against the September 1, 2009 claim.

---

[13]In *Ortiz v. Werner Enterprises, Inc.*, — F.3d —, 2016 WL 4411434 (7th Cir. Aug. 19, 2016), the Seventh Circuit overruled *Oest*, but only "to the extent that [it] insist[ed] on the use of the direct-and-indirect framework" to prove discrimination. 2016 WL 4411434, at *5. As noted earlier, the Seventh Circuit made clear that *Ortiz* in no way concerned the *McDonnell Douglas* burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* So, the only portion of *Oest* that the Court relies on here is that portion analyzing the plaintiff's claim under the *McDonnell Douglas* framework, which was not overruled by the Seventh Circuit and is still good law. *Oest*, 240 F.3d at 612-615 (discussing plaintiff's claim "under the familiar … burden-shifting approach").

## 2. June 30, 2011 Incident

Bailey next claims that he was discriminated against on June 30, 2011, when he was issued a letter of warning, which was later reduced to a job discussion, for leaving deliverable mail on empty postal equipment. Am. Compl. ¶¶ 17-19; DSOF ¶¶ 19, 21. There are several problems with this claim. First, Bailey has again failed to show that he suffered an adverse employment action. As discussed above, "[a]n adverse employment action is one that significantly alters the terms and conditions of the employee's job." *Griffin*, 356 F.3d at 829. In the case of a reprimand or negative performance evaluation, the discrimination must lead to some tangible job consequence. *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 731 (7th Cir. 2004) ("There must be some tangible job consequence accompanying the reprimand to rise to the level of a material adverse employment action."). Here, the only consequence Bailey faced for leaving deliverable mail behind was a job discussion. DSOF ¶ 21; 11/22/11 Step B Decision at 000323-324. But a job discussion is not considered discipline by the Postal Service. JCAM Art. 16.1 at 007906 ("[Job] discussions are not considered discipline and are not grievable."). Nor is it noted in an employee's personnel file so as to potentially impact future discipline under the Postal Service's progressive discipline system, even if a potential impact under a progressive discipline system could qualify as an adverse employment action. *Id.* ("[N]o notation or other information pertaining to such [job] discussion shall be included in the employee's personnel folder."). Because Bailey has not shown that the Postal Service's actions caused any sort of real harm to his compensation, terms of employment, benefits, or

privileges, Bailey has failed to show he suffered an adverse employment action. *Whittaker*, 424 F.3d at 648 (explaining that reprimands that lead to "ineligibility for job benefits like promotion, transfer to a favorable location, or an advantageous increase in responsibilities" could be adverse actions); *Sweeney v. West*, 149 F.3d 550, 556-57 (7th Cir. 1998) (concluding that "two counseling statements" admonishing employee to improve were not materially adverse actions in retaliation context where employee had not pointed to any immediate consequence of the reprimand such as eligibility for promotion, transfer to a favorable location, or something similar); *Lollis v. Donahoe*, 2012 WL 33005, at *5 (N.D. Ill. Jan. 6, 2012) (in retaliation context, noting that "[t]he pre-disciplinary interview is not an adverse employment action as a matter of law").

Bailey also fails to show that a similarly situated person outside his protected class was treated more favorably than he was. Bailey points only to Rosa Martinez (female and Hispanic). DSOF ¶ 59; Pl.'s Suppl. Discovery Resp. Ltr. at 2; Pl.'s Resp. Br. at 14-15. Martinez was similarly disciplined for failing to perform her duties as assigned when deliverable mail was found in her mail truck. R. 39, Exh. 54, Martinez 7/09/11 Notice of Suspension. Several pieces of mail had slipped in between the window and door of Martinez's postal truck; the mail was discovered after the door was removed during repairs.[14] *Id.*; R. 39, Exh. 52, Collins 2013 EEO

---

[14]Bailey challenges these facts; he claims that at the time mail was allegedly found in Martinez's truck, "postal employees were using LLV trucks, [which had] no such door." Pl.'s Resp. Br. at 14; PSOF ¶ 38. But even if true, Bailey does not offer any evidence which would suggest that Martinez was not issued the suspension described in the suspension notice provided by the Postal Service for this truck incident, *see* Martinez 7/09/11 Notice of Suspension.

Aff. ¶ 42; R. 39, Exh. 53, Puri 2013 EEO Aff. ¶ 40. Martinez was issued a seven-day suspension for this incident, Martinez 7/09/11 Notice of Suspension, which Bailey asserts was later reduced to a job discussion (although Bailey fails to attach the cited exhibit—Exhibit V—supporting this contention so the Court cannot verify it), *see* Pl.'s Resp. to DSOF ¶ 60 (referring to Exhibit V).[15]

The problem for Bailey here is that regardless of whether Martinez was issued a seven-day suspension or just a job discussion, Bailey cannot show that Martinez "was treated *more* favorably" by the Postal Service. *Wyninger*, 361 F.3d at 978 (emphasis added). At most, Bailey could show that he and Martinez were treated similarly, as Bailey too ultimately received a job discussion. 11/22/11 Step B Decision at 000323-324. But receiving equal treatment is not the same as receiving less favorable treatment than the proposed comparator. Bailey separately suggests that because his discipline was not reduced until Step B of the grievance process, whereas Martinez's was supposedly reduced during informal Step A, his punishment was somehow harsher or dissimilar. Pl.'s Resp. Br. at 14; Pl.'s Resp. to DSOF ¶ 60; PSOF ¶ 39. Again, Bailey fails to attach any exhibit which shows that Martinez's discipline was reduced during Step A (or at all for that matter), so this allegation is unsupported. But regardless, even assuming Bailey is correct, this minor distinction does not alter the result. In both instances, Martinez and Bailey

---

[15]Bailey does attach what may be the same exhibit to his statement of material facts. R. 48, Exh. 12, Martinez Form 8190; *see also* PSOF ¶ 39. But that exhibit is only a page and does not mention Martinez's suspension being reduced to a job discussion. *See generally* Martinez Form 8190. So it does not provide support for Bailey's allegation either. The Postal Service, for its part, disputes that Martinez's suspension was reduced. Def.'s Resp. to PSOF ¶ 39.

would have been required to go through the grievance process, and in both instances their discipline would have been reduced to a job discussion. The slight distinction between *when* in the grievance process their discipline would have been reduced does not alter the fact that both ultimately faced similar discipline for a similar infraction. So Bailey might not have liked how far he had to proceed in the grievance process, but he cannot show that he faced worse treatment than Martinez. Indeed, a reasonable factfinder could conclude that he was actually treated more favorably. Def.'s Resp. to PSOF ¶ 39 (asserting Martinez's suspension was never reduced). *See Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) ("not everything that makes an employee unhappy is an actionable adverse action" (internal quotation marks and citation omitted)).

Finally, even if the Court were to assume that Bailey could establish a prima facie case of discrimination here, Bailey fails to show that the Postal Service's stated reason for issuing the discipline was a pretext for discrimination. Once a prima facie case of discrimination is shown, the burden shifts to the defendant to articulate a legitimate, non-invidious reason for its action. *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir. 1994); *Atanus*, 520 F.3d at 672. If the defendant articulates such a reason, then the burden shifts back to the plaintiff to show that the stated reason is a pretext for discrimination. *Id.*; *Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1309 (7th Cir. 1997). The plaintiff must present evidence showing "that a discriminatory reason motivated the employer's decision," or that the defendant could not have "honestly believed its proffered reason." *Id.* at 1310; *Russell v. Acme-*

*Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995) (explaining that pretext means more than a "mistake," "[i]t means a lie, specifically a phony reason for some action"); *Hughes*, 20 F.3d at 747 ("An employee may establish pretext by proving … defendant's explanation had no basis in fact, or … the explanation was not the 'real' reason, or … at least the reason stated was insufficient to warrant the discharge." (internal quotation marks and citation omitted)).

In this case, Puri stated that she disciplined Bailey after a distribution clerk told her that several pieces of deliverable mail from Bailey's route were found in a tray that was to be returned to the plant with other undeliverable mail. DSOF ¶ 19; Puri 2012 EEO Dep. 8:20-9:17; Puri 2011 EEO Aff. ¶ A11. Bailey does not offer any evidence to suggest that the clerk reported things differently or that Puri did not honestly believe what the clerk reported to her. Nor does Bailey suggest that misplacing deliverable mail is not a proper reason to issue discipline. *See Cabrera v. Legal Assistance Found. of Chi.*, 2002 WL 31324051, at *4 (N.D. Ill. Oct. 17, 2002) (rejecting pretext argument on similar grounds). Bailey simply states that "Martinez's more favorable treatment evidences pretext." Pl.'s Resp. Br. at 14. But while evidence of differential treatment is an accepted means of showing pretext, *see McDonnell Douglas Corp.*, 411 U.S. at 804; *Essex*, 111 F.3d at 1311*; Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 561 (7th Cir. 1998); *Cabrera*, 2002 WL 31324051, at *5, as already discussed, Bailey has not shown that he was treated any differently than Martinez (or any other similarly situated employee). Because no reasonable juror could conclude that Martinez was treated better than Bailey

(indeed, it is possible that a juror could actually conclude that Bailey was treated better), Martinez's incident does not give rise to a reasonable inference of pretext. The Court grants summary judgment to the Postal Service on this claim.

### 3. Incidents on August 4, 2011, August 9, 2012, and February 16, 2013

Next, Bailey asserts he was discriminated against when he was disciplined for leaving deliverable mail in his UBBM bin. Am. Compl. ¶¶ 20-21, 27, 29-30, 36-38, 40; DSOF ¶¶ 22, 32, 40. This occurred on three separate occasions. Because these claims are so similar, the Court discusses them together.

The first incident occurred on August 4, 2011, when Collins issued Bailey a seven-day suspension after a clerk informed him that deliverable mail was found in Bailey's UBBM bin; that suspension was later reduced to a letter of warning. DSOF ¶¶ 22, 24; 8/04/11 Notice of Suspension; 11/21/11 Step B Decision at 000330. Bailey faces a similar problem with this claim as he did in his prior claim—he is unable to establish that a similarly situated individual outside his protected class was treated more favorably. Bailey points to PTF-carriers LaTanya Rogers (female and African-American) and Rosa Martinez (female and Hispanic). DSOF ¶ 62; Pl.'s Suppl. Discovery Resp. Ltr. at 2. Bailey contends that Rogers was treated more favorably than he was when deliverable mail was found in her UBBM bin on May 12, 2012 and on May 21, 2012. DSOF ¶ 62; Pl.'s Suppl. Discovery Resp. Ltr. at 2; R. 39, Exh. 55, Rogers 6/07/12 Ltr. of Warning at 003073. But like Bailey, Rogers received a letter of warning for the failures. Rogers 6/07/12 Ltr. of Warning at 003073. So

Bailey has not shown that she was treated more favorably than he was.[16] And as discussed above, Rosa Martinez was issued a seven-day suspension for leaving deliverable mail in her postal truck (remember, Bailey failed to establish that Martinez's suspension was reduced to a job discussion). Martinez 7/09/11 Notice of Suspension. So there too, Bailey is unable to show that another carrier was treated better.[17]

Bailey also fails to show that the Postal Service's stated reason for disciplining him was pretextual. According to Bailey, this incident was "clearly [the Postal Service's] way of attempting to terminate [him]." Pl.'s Resp. Br. at 15. But Bailey again fails to present any evidence to suggest that the clerk who informed Collins about this incident reported anything different or that Collins did not honestly believe what the clerk told him. Nor does Bailey assert that misplacing deliverable mail is not a matter worthy of discipline. *Cabrera*, 2002 WL 31324051, at *4 (rejecting pretext argument on similar grounds).

Bailey also attempts to show pretext by explaining that he could not have engaged in this alleged misconduct because carriers cannot dispose of UBBM. Pl.'s Resp. Br. at 15. Bailey explains that the Postal Service's "Management Instruction Manual" defines UBBM as "live mail" until it has been picked up by the mill or

---

[16]Bailey makes no argument related to Rogers having mail found in her UBBM bin on two separate occasions six days apart.

[17]There is additional evidence to suggest that Martinez might not be similarly situated to Bailey. The Postal Service asserts that in Martinez's case (unlike in Bailey's case), the Postal Service could not be certain whether she was the one who misplaced the mail because other carriers had used her truck during the time period in which the mail would have fallen. DSOF ¶ 60; Collins 2013 EEO Aff. ¶¶ 42-43 ("It could not be established who or when the mail was left in her truck … ."); Puri 2013 EEO Aff. ¶¶ 40-41 (stating the same).

broker for final "disposal." *Id.* (citing PSOF ¶ 5). As a result, says Bailey, carriers do not dispose of UBBM even when they place it in their UBBM bins, so he could not have engaged in this misconduct. *Id.* But Bailey fails to actually attach this manual to his statement of facts, so the Court has no way of verifying whether this is in fact the post office's policy.[18] The Postal Service suggests that it is not. Def.'s Reply Br. at 11. But even assuming that the manual says what Bailey alleges it does, Bailey's argument still fails to show that the Postal Service's stated reason for disciplining him was pretextual. For one, Bailey's argument rests on a mere technicality. Although the mail found in Bailey's UBBM tub may have technically been "live mail," for all intents and purposes, it was sorted as discarded mail or UBBM. This minor technicality does little to discredit the Postal Service's stated reason for disciplining him. Bailey's assertion that carriers do not discard mail is further weakened by evidence suggesting that part of a carriers' role is to identify UBBM. *See* Puri 2013 EEO Decl. ¶ 5 ("At the Wood Dale Post Office, while a carrier is casing his/her route, it is his/her responsibility to identify UBBM (as mail that will be disposed of as waste) in a UBBM tub at the carrier's case." (citing City Delivery Carriers Duties and Responsibilities, Handbook M-41)); *see also* Puri 2011 EEO Aff. ¶ A15 (M-41 handbook excerpt); R. 47, Exh. M, Puri 2013 Dep. 17:9-18:7 (explaining that carriers are assigned red color coded tubs to put undeliverable standard mail in, which is then verified by a clerk and sent to the plant to be discarded). Bailey does not contest this. Accordingly, this alleged statement in the Postal Service's

---

[18]The only cite Bailey provides that actually supports this fact is Watson's affidavit. *See* PSOF ¶ 5. But as already discussed, that affidavit is not properly before this Court.

manual, even when viewed in Bailey's favor, does not discredit Collins' stated reason for disciplining Bailey.

Bailey also explains that there is no official post office policy on disciplining carriers for placing deliverable mail in their UBBM bin, which he suggests shows that the Postal Service's purported reason was pretextual. Pl.'s Resp. Br. at 16. But contrary to Bailey's contention, this fact does not raise an inference of pretext. It makes sense that the Postal Service would want to discipline letter carriers for not properly sorting through the mail for their assigned routes. The Postal Service is in the business of delivering mail; improper sorting prevents the Postal Service from doing its job properly. Presumably, this is why the Postal Service has adopted what appears to be an informal policy of disciplining carriers who fail to properly sort their mail. Collins 2015 Dep. 10:17-18 ("From my recollection, mail being disposed of in a UBBM is a violation."); *id.* 13:17-21 ("[A]s a carrier for 20 years, I do know that one of our jobs is not to discard first class mail in the UBBM tub, because the UBBM is mail that is going to be discarded in the trash."). Bailey fails to present any evidence to cast doubt on whether such a disciplinary practice exists; indeed, the Postal Service's decision to discipline Bailey, Rogers, and Martinez for this type of conduct supports the existence of such a policy. 8/04/11 Notice of Suspension; Rogers 6/07/12 Ltr. of Warning; Martinez 7/09/11 Notice of Suspension. *Cf. Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1040 (7th Cir. 1993) (concluding that material fact existed where there was conflicting testimony about the existence of a no-

interoffice-dating policy). The lack of a formal UBBM policy does not suggest pretext in this context. Bailey's claim here fails.

The second incident occurred on August 9, 2012, when Collins issued Bailey a seven-day suspension after a clerk again found deliverable mail in Bailey's UBBM bin. DSOF ¶ 32; 8/09/12 Notice of Suspension. This suspension was not reduced. Bailey runs into similar pretext problem with this incident—he fails to present any evidence to suggest that the clerk reported something different to Collins, that Collins did not honestly believe what the clerk told him, or that this was not an issue worthy of discipline. *Cabrera*, 2002 WL 31324051, at *4 (rejecting pretext argument on similar grounds). The only new challenge Bailey makes is to the Postal Service's contention that Bailey was disciplined, in part, because he refused to discuss the incident with Collins. Pl.'s Resp. Br. at 16-17; Def.'s Br. at 19 ("Collins disciplined Bailey because … [w]hen Collins tried to discuss the UBBM mail with Bailey, he refused to discuss it, clocked out, and left the facility."). According to Bailey, he simply asked for union representation when Collins sought to discuss the incident with him, but because there was no union representative available at that time, the meeting had to be rescheduled. Pl.'s Resp. to DSOF ¶ 33; Bailey 2013 EEO Dep. 30:16-31:4; 8/09/12 Notice of Suspension at 000530. Bailey asserts that he never refused to discuss the incident with Collins, as the Postal Service alleges, so the Postal Service's stated reason for issuing this discipline must be pretextual. Pl.'s Resp. Br. at 16-17. But this argument is unavailing. To be sure, there does appear to be a genuine dispute over Bailey's reaction when Collins approached him. Bailey

asserts he simply requested union representation and that Collins became upset, Bailey 2013 EEO Dep. 31:1-13, while Collins asserts that Bailey became agitated and started yelling, Collins 2013 EEO Decl. ¶ 8; 8/09/12 Notice of Suspension at 000530. But this fact is not material. To establish pretext, Bailey must show that the Postal Service's articulated reason for the discipline—a clerk finding deliverable mail in Bailey's UBBM bin—had no basis in fact, did not actually motivate the Postal Service's decision, or was insufficient to motivate the action. *Hughes*, 20 F.3d at 746. Bailey has failed to do this. He has failed to specifically refute the Postal Service's contention that a clerk told Collins about deliverable mail being in Bailey's UBBM bin, or its contention that Collins believed the clerk. He has also failed to show that the Postal Service's decision to discipline him for this incident was so unreasonable that it must be pretext. As already discussed, part of a letter carrier's job is to properly identify undeliverable mail. Collins 2015 Dep. 13:15-21, 15:14-18. Disciplining Bailey for failing to do his job properly does not show pretext. Simply put, no reasonable factfinder would find "'the [Postal Service's] proffered explanation is unworthy of credence.'" *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

Finally, turning to the last UBBM incident, in December 2012, Collins issued Bailey a notice of removal after a clerk told Collins that deliverable mail was again found in Bailey's UBBM bin. 12/22/12 Notice of Removal; DSOF ¶ 40. That notice was later rescinded due to a typographical error and on February 16, 2013, Collins

issued Bailey a 14-day suspension instead. 2/08/13 Rescission of Notice of Removal; 2/16/13 Notice of Suspension. Bailey again fails to show that a similarly situated employee—he still only points to Rogers and Martinez—was treated more favorably, Pl.'s Suppl. Discovery Resp. Ltr. at 2. This was the third time Bailey was disciplined for leaving deliverable mail in his UBBM bin. Rogers appears to have been disciplined only twice, *see* Rogers 6/07/12 Ltr. of Warning at 003073 (noting that deliverable mail was found in Rogers' UBBM bin on May 15, 2012 and again on May 21, 2012), and Martinez just once, *see* Martinez 7/09/11 Notice of Suspension. Because the Postal Service employs a progressive discipline system, JCAM Art. 16.1 at 007904, it follows that Bailey would face harsher punishment for his incident than Rogers or Martinez did for theirs. Indeed, Bailey's notice of suspension specifically references the prior discipline he received in August 2012 for leaving deliverable mail in his UBBM bin.[19] 2/16/13 Notice of Suspension at 000889 (considering Bailey's 8/09/12 seven-day suspension). These differing performance histories make the comparison between Bailey and Rogers or Martinez more difficult and less useful. *See Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (stating that the similarly situated requirement is intended to "eliminate other possible explanatory variables, such as differing roles, *performance histories*, or decision-making personnel, which helps isolate the critical independent variable— discriminatory animus" (emphasis added; internal quotation marks omitted)).

---

[19]It is worth noting that because Bailey's notice of suspension specifically indicates that Bailey's prior suspension was taken into account, a persuasive argument could be made that Bailey's suspensions are adverse employment actions even though they are working suspensions. The Postal Service disputes this point. *See* Def.'s Br. at 10.

What's more, Bailey still fails to show that the Postal Service's purported reason for disciplining him was a pretext for discrimination. Bailey contends that this was the first time that Collins had ever rescinded and reissued discipline. Pl.'s Resp. Br. at 17-18; Collins 2015 Dep. 92:15-95:10. But that fact does not show that Collins's stated reason for issuing the discipline—a clerk finding deliverable mail in Bailey's UBBM bin for a third time—was a lie or lacked any basis in fact. Nor does the fact that Collins' rescission letter might not have precisely followed post office procedure (at least not without some other evidence of discrimination) give enough grounds for a reasonable factfinder to find pretext here. *Id.* at 17; *Kipnis v. Baram*, 949 F. Supp. 618, 623 (N.D. Ill. 1996) (explaining that "the misapplication of normal procedures [related to EEO complaints] is not sufficient to support a Title VII claim (citing *Friedel v. City of Madison*, 832 F.2d 965, 974 (7th Cir. 1987)). This evidence fails to cast doubt on Collins stated reason for disciplining Bailey.

Finally, even when these three incidents are considered together, Bailey still fails to show that a reasonable factfinder could conclude that he was disciplined because of his race or gender. Bailey argues he never left any deliverable mail in his UBBM tub. But he fails to present any evidence to suggest that in each instance, the distribution clerk did not find the mail as suggested, that the clerk did not report it to Collins, or that Collins honestly did not believe the clerk. He also does not contest that it is part of a carrier's job to sort mail, including UBBM mail. As discussed earlier, although there might not be a formal policy in place for disciplining carriers for misplacing deliverable mail, the Postal Service's decision to

discipline carriers for this does not raise an inference of pretext. The discipline Bailey received also grew increasingly more severe with each incident—warning letter, seven-day suspension, 14-day suspension—as it is supposed to under the Postal Service's progressive discipline system. JCAM Art. 16.1 (requiring supervisors to "issue discipline in a 'progressive' fashion, issuing lesser discipline (e.g., a letter of warning) for a first offense and a pattern of increasingly severe discipline for succeeding offenses (e.g., short suspension, long suspension … )). As a whole, this evidence fails to raise a genuine issue of material fact as to whether Bailey was discriminated against in these three instances. Accordingly, the Court grants summary judgment to the Postal Service on all three of Bailey's UBBM claims.

### 4. Incident on August 25, 2011

Bailey next claims that he was discriminated against when he was only allowed to work 5.15 hours on August 25, 2011, despite still being on his temporary hold-down assignment, while another PTF-carrier and two transitional employees— none of whom were African-American males—were allowed to work full days. Am. Compl. ¶ 22; DSOF ¶¶ 25-26. On this particular claim, Bailey has enough evidence—though barely and only because he is given the benefit of all reasonable inferences at this stage, *see Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587—to survive summary judgment.

For this claim, the Postal Service does not contest the first two elements of the *McDonnell Douglas* framework: (1) that Bailey is a member of a protected class

and (2) that he performed his job to the Postal Service's legitimate expectations. *See generally* Def.'s Br. at 7, 9; *Atanus*, 520 F.3d at 672-73. This then leaves the last two elements: (3) whether Bailey suffered an adverse employment action and (4) whether similarly situated individuals outside his protected class were treated more favorably. *Id.* Although the Postal Service challenges these two prongs, Bailey has presented enough evidence to satisfy them.

First, a reasonable juror could conclude that Bailey suffered an adverse employment action. Puri's decision to split Bailey's route led to Bailey being sent home about three hours early that day. Because Bailey did not work a full day, presumably, he did not receive a full day's worth of wages. These lost wages are of course real and tangible. In addition, because Bailey was still on his hold-down assignment at that time, *see* Collins 2012 EEO Dep. 34:7-9 (noting that Bailey was still on hold-down), he was also entitled to work his full shift that day. *See* JCAM Art. 41.2B.3-B.5 at 008024 ("An employee who successfully opts for a hold-down assignment is said to be guaranteed the right to work the hours of duty and scheduled days of the regular carrier."); *id.* ("Employees on hold-downs are entitled to work the regularly scheduled *days* and *the daily hours of duty* of the assignment."). Puri's decision to split Bailey's route could also be viewed as infringing that right. Bailey's reduced pay, coupled with the loss of his right to work his hold-down shift for that day, constitutes real harm. *Griffin*, 356 F.3d at 830 (denial of a raise can constitute a materially adverse employment action if that raise was "an expected element of the employee's salary and its denial cuts the

salary in real terms"); *Duncan v. Thorek Mem'l Hosp.*, 784 F. Supp. 2d 910, 919 (N.D. Ill. 2011) (finding that demotion from full-time to part-time constituted adverse employment action where plaintiff suffered lost wages from working fewer hours and lost several vacation days). *See also Russell v. Bd. of Trs. of the Univ. of Ill. at Chi.*, 243 F.3d 336, 341 (7th Cir. 2001) (stating that a five-day suspension was materially adverse because it was a formal disciplinary action and the employee lost a week's pay); *see also Crady*, 993 F.2d at 136 ("A materially adverse change might be indicated by … a demotion … , a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."). This evidence is sufficient to show that Bailey suffered an adverse employment action.

The Postal Service, for its part, tries to recast Bailey's argument by asserting that a court is not to act as a "super-personnel department" and that employers may schedule employee work hours without running afoul of Title VII. Def.'s Br. at 11 (quoting *Beverly v. Kaupas*, 2008 WL 624045, at *14 (N.D. Ill. Feb. 29, 2008) and *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 435 (7th Cir. 2005) (holding that inconvenient work hours do not constitute an adverse employment action)). That is of course generally true. But the Postal Service ignores the fact that Bailey was on a hold-down assignment in August 2011, and Rogers was not. Collins 2012 EEO Dep. 34:7-9. Viewing the evidence in Bailey's favor, this gave Bailey the right to work the days and hours of his bid assignment. JCAM Art. 41.2B.3-B.5 at 008024. Rogers did not enjoy this same privilege, nor did Barszczewski or Stewart. So more than just a

disagreement with hours is present here. Bailey has shown that he suffered an adverse employment action.

Bailey has also shown that he received different, less favorable treatment that someone outside his protected class. Bailey offers evidence showing that PTF-carrier LaTanya Rogers (a woman) was allowed to work 8.98 hours that day. Pl.'s Resp. to DSOF ¶¶ 25-26; Hours Analysis at 000339, 000342; Bailey Dep. 42:25-43:2. Rogers was not on a hold-down assignment at that time. Collins 2012 EEO Dep. 34:17-19. Bailey also offers evidence showing that transitional employees Rafael Barszczewski (male and Caucasian) and Debra Stewart (female) were allowed to work 8.25 hours and 8.00 hours that day, respectively. Hours Analysis at 000339, 000342. What's more, there is evidence demonstrating that PTF-carriers on hold-down assignments are considered more senior then either PTF-carriers not on bid assignment or transitional employees. Collins 2015 Dep. 41:6-15, 117:11-118:3; Puri 2015 Dep. 22:9-21. Thus, it would appear that Bailey should have actually had priority over these other employees in working a full day on August 25. Puri 2015 Dep. 69:5-8 ("Q. Can work be taken from a PTF on a Hold-Down Assignment and given to PTFs who are not on Hold-Down Assignments? A. No."). So Rogers, Barszczewski, and Stewart were more junior for purposes of the hours allotment, and this evidence is sufficient to show that Bailey was treated less favorably than others outside of his protected class. Bailey has established a prima facie case of discrimination.

In response, the Postal Service asserts that it had a legitimate, non-discriminatory reason for its action. Def.'s Br. at 19; Def.'s Reply Br. at 11-12. It explains that Puri needed to take work from a PTF-carrier that day because mail was "light" and full-time carriers needed to be able to work their full eight-hour days, Puri 2011 EEO Aff. ¶ A25; the Postal Service also explains that Puri decided to split Bailey's route rather than another carrier's because it was more efficient and would help even-out the weekly hours between Bailey and Rogers, both of whom where PTF-carriers at the time, *id.*; Puri 2012 EEO Dep. 43:20-45:14. To cast doubt on this alleged reason, Bailey points to Collins and Puri's statements that PTF-carriers on hold-down assignment are generally viewed as being more senior than non-hold-down-PTF-carriers and transitional employees. Pl.'s Resp. Br. at 19; *see also* Collins 2015 Dep. 117:11-118:3; Puri 2015 Dep. 22:9-21. He also points to Collins's statement that in the event a full-time employee needed hours and there were two PTF-carriers—one on hold-down and one without a hold-down assignment—he would not send anyone home but would instead reduce both PTFs' hours. Pl.'s Resp. Br. at 19, Collins 2015 Dep. 37:9-24. And although Bailey does not point to it, there is also evidence in the record to suggest that Puri knew Bailey was on a hold-down assignment on August 25. Puri 2012 EEO Dep. 43:20-44:1. Based on this evidence, a reasonable factfinder could conclude that Puri knew that PTF-carriers with hold-down assignments have priority over work hours, that Puri also knew Bailey was on a hold-down assignment, and that she purposely disregarded all of this because of Bailey's race or gender when she allowed three more junior

employees outside of Bailey's protected class to take several of Bailey's hours.[20] This evidence is sufficient to cast doubt on the Postal Service's purported reason for splitting Bailey's route, and to raise a genuine issue of material fact as to whether Bailey was treated less favorably simply because of his race or gender. On balance, when all reasonable inferences are viewed in Bailey's favor, Bailey has presented enough evidence to create a genuine issue of triable fact as to whether Puri's stated reason for splitting Bailey's route on August 25 was a pretext for discrimination. Bailey's claim here withstands summary judgment.

### 5. Incident on September 25, 2012

Bailey next claims discriminatory treatment when he was denied sick leave on September 25, 2012. DSOF ¶ 34; Am. Compl. ¶¶ 31, 34. Bailey requested sixteen hours of sick leave for September 24 and September 25, 2012, but he was only granted eight. DSOF ¶ 34; Pl.'s Resp. to DSOF ¶ 34; Bailey 2015 Aff. ¶ 9. According to Puri, Bailey was denied sick leave on September 25 because it was his non-scheduled day for Route 4 (Bailey's temporary hold-down assignment) and Bailey was already scheduled to work forty hours that week. Puri 2013 EEO Dep. 41:8-16.

---

[20]Again, the Court emphasizes that this conclusion is dictated only when viewing the evidence in Bailey's favor. It would also be reasonable for a juror to conclude there was no discrimination, based on the evidence that Puri really did believe that she needed to take hours from a PTF-carrier, that the most efficient way to do that was to split Bailey's route, and that Bailey agreed to split his route. Puri 2012 EEO Dep. 44:20-45:14. Both Collins and Puri also stated that the Wood Dale Post Office had a verbal agreement with the union steward to equalize PTF-carrier hours. Collins 2012 EEO Dep. 39:10-15; Puri 2012 EEO Dep. 46:21-24. And even if Puri mistakenly thought she could alter employee hours, the ultimate "inquiry is not whether the reason for the [action] was a correct business judgment but whether the decisionmaker[] honestly acted on that reason." *Bahl*, 115 F.3d at 1291; *Essex*, 111 F.3d at 1310 ("The fact that the employer was mistaken or based its decision on bad policy, or even just plain stupidity, goes nowhere as evidence that the proffered explanation is pretextual."). Those principles will ultimately govern the jury's decision.

Like many other claims he has proposed, Bailey again fails to make out a prima facie case of discrimination on this one. Specifically, he fails to show that a similarly situated postal worker not in his protected class (male or African American) was treated more favorably than he was by the Postal Service. Bailey again points to Rogers (female and African American), who he claims was similarly situated to him and treated more favorably than he was when she requested sick leave on October 1 and October 2, 2012. DSOF ¶ 64; Pl.'s Suppl. Discovery Resp. Ltr. at 1-2. Like Bailey, Rogers was a PTF-carrier in October 2012 when she requested sick leave. Puri 2013 EEO Dep. 42:15-43:1. Bailey argues that although October 2 was a non-scheduled day for Rogers on her assigned route, *id.* 43:11-13; Puri 2013 EEO Decl. ¶ 15, just like September 25 was for Bailey, all sixteen hours of Rogers' requested leave was approved, Pl.'s Resp. to DSOF ¶¶ 65-66; Pl.'s Resp. Br. at 21.

It is true that Rogers initially received approval for sixteen hours of sick leave for October 1 and October 2, 2012. *See* Puri 2013 EEO Decl. ¶ 15. But Bailey leaves out several critical facts that are fatal to his claim. On the day that Rogers requested sick leave, Puri was out of the office and a substitute manager was working in her place. *Id.* That substitute manager was the one who approved Rogers' sixteen hours of leave, which resulted in Rogers being paid for a combination of 52.84 hours of work and leave for that service week. *Id.* But when Puri returned and realized what had happened, she issued Rogers a pay adjustment *taking back* the eight hours of sick leave given to her on October 2, her non-

scheduled day for her assigned route. *Id.* ¶¶ 16-18; R. 39, Exh. 56, Invoice to LaTanya Rogers. So like Bailey, Rogers was only paid for eight hours of sick leave, and she was denied sick leave on the non-scheduled day for her assigned route.

Bailey contends that Rogers was still paid for those eight hours because the invoice deducting the incremental eight hours from her pay cryptically states that "8.00 hours of sick leave has been changed to work hours." Invoice to LaTanya Rogers at 004130; Pl.'s Resp. to DSOF ¶¶ 65-66. But it is not clear what this statement even means, and more importantly, Bailey fails to provide any actual evidence showing that Rogers was indeed repaid for those eight hours of leave that she had to pay back. Apparently, Bailey did not pursue this further in discovery. Without some evidence that a reasonable factfinder can rely on to find that the Postal Service repaid Rogers for eight work hours on October 2, 2012, Bailey fails to show that Rogers was treated more favorably than he was. In fact, it appears Puri treated them exactly the same.

Bailey also argues that another carrier, Rosa Villareal (female and Hispanic), was treated more favorably with regard to sick leave. Pl.'s Resp. Br. at 21. But Bailey runs into problems here too. For one, it does not appear that Bailey identified Villareal during discovery as a similarly situated individual for this particular incident. Pl.'s Suppl. Discovery Resp. Ltr. at 2 (discussing Villareal only in conjunction with a different incident). Bailey also fails to present evidence showing that Villareal's leave was similarly subjected to Puri's approval. *See Coleman*, 667 F.3d at 835 (identifying different "decision-making personnel" as a

reason why employees may not be similarly situated). The Postal Service asserts that Bailey's sick leave was denied because of how Puri interpreted the relevant policy in the employee manual. Puri 2013 EEO Dep. 41:8-16; Employee Manual at 007787. If Puri did not similarly approve Villareal's leave, then this evidence would do little to show that Puri did not honestly believe that her interpretation of the policy was correct. The evidence related to this incident could not lead a reasonable juror to conclude that Bailey was discriminated against on account of his race or gender.

### 6. Incident on October 23, 2012

Bailey contends that he was discriminated against when he was issued a 14-day suspension on October 23, 2012 for having three unscheduled absences within a three-month period. Am. Compl. ¶¶ 32-33; DSOF ¶¶ 37-38. But Bailey again fails to show that a similarly situated employee not in his protected class was treated more favorably. Bailey alleges that Dannie Mamparo (male and Asian) and Rosa Martinez (female and Hispanic) were both treated better than he was even though their attendance, and in particular, their number of unscheduled absences, were worse than his in 2012. DSOF ¶ 67; Pl.'s Suppl. Discovery Resp. Ltr. at 2. Martinez was issued a seven-day suspension for her absences, R. 39, Exh. 57, Martinez 4/02/13 Notice of Suspension, and Mamparo was issued a letter of separation, R. 39, Exh. 59, Mamparo 7/29/13 Ltr. of Separation at 003148, which was later withdrawn, R. 47, Exh. X, Mamparo 10/9/13 Step A Decision at 003678.

It is true that both Martinez and Mamparo had more unscheduled absences than Bailey did, and that the punishment they received was less harsh. *See* Martinez 4/02/13 Notice of Suspension at 003071 (noting unscheduled absences for Martinez on August 23-24, 2012, September 18-September 22, 2012, and September 25-October 6, 2012); Mamparo 7/29/13 Ltr. of Separation at 003148 (noting Mamparo was absent from his official duties from October 2011 through at least July 2013). But unlike Bailey, both Martinez and Mamparo explained their absences. Martinez's absences occurred around the same time her daughter was kidnapped and assaulted. DSOF ¶ 68; R. 39, Exh. 38, Collins 2014 EEO Dep. 47:23-48:24. And although Bailey contends that "[t]here is no independent evidence that supports the alleged reasons for Martinez's absences," Pl.'s Resp. to DSOF ¶ 68, Bailey himself stated in his deposition that Martinez told him that her daughter was kidnapped and assaulted around the relevant time, Bailey Dep. 61:20-23 ("Q. Were you aware that Ms. Martinez's daughter was kidnapped and assaulted during that period which caused her to miss work? A. She told me that."). Mamparo likewise offered an explanation for his absence by submitting medical documentation. DSOF ¶ 69; Puri 2013 EEO Decl. ¶ 50; R. 39, Exh. 58, Puri 2015 Dep. 62:8-16. This is in contrast to Bailey who did not provide any explanation for his absences. Pl.'s Resp. to DSOF ¶ 38. Bailey also makes much of the fact that Mamparo was absent for over a year without allegedly receiving appropriate approval and without any disciplinary consequences. Pl.'s Resp. Br. at 22; Pl.'s Resp. to DSOF ¶ 69. But even so, Mamparo's situation is still too distinct from

Bailey's to allow for a meaningful comparison or to show that Bailey "was singled out for worse treatment." *Crawford v. Ind. Harbor Belt. R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006). Mamparo was in a different role—he was a full-time carrier—and his medical issues offer a plausible explanation for his differing treatment. *Coleman*, 667 F.3d at 847 (for similarly situated requirement, generally, "plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them"). Bailey has failed to show that Martinez or Mamparo were similarly situated and treated more favorably.

Finally, Bailey also notes that there is no rule at the Wood Dale post office requiring disciplinary action for three or more unscheduled absences in a three-month period. Pl.'s Resp. Br. at 22. Presumably, Bailey is suggesting that this shows that the Postal Service's alleged reason for disciplining him was nothing more than a lie. But there is evidence that this policy of disciplining carriers for three unscheduled absences in a three-month period is an unwritten local policy at the Wood Dale Post Office. Puri 2015 Dep. 33:22-34:9. And the adoption of such a practice is not so unusual as to suggest pretext. It makes sense that the Postal Service would want to implement a policy like this to discourage unscheduled absences among its carriers. Bailey has failed to cast doubt on the Postal Service's stated reason for disciplining him. Because Bailey has failed to make out a prima facie case of discrimination here, or to show that the Postal Service's stated reason

for disciplining him was pretextual, the Court grants summary judgment to the Postal Service on this claim.

### 7. Delay in Conversion to Full-Time Carrier

Bailey next contends that he was discriminated against when Puri refused to convert him to a full-time carrier until November 2013. Am. Compl. ¶ 47; DSOF ¶¶ 46, 49. Bailey argues that he should have been converted to a full-time carrier in January 2013, when Rosa Villareal (female and Hispanic) was converted to a T6 swing position, a full-time carrier position. Pl.'s Third Resp. to Def.'s Interrog. at 9; PSOF ¶ 18. According to Puri, Bailey was not converted in January 2013 because a national moratorium was in effect at that time, which precluded PTF-carriers from being converted to full-time positions other than T6 swing positions. PSOF ¶¶ 19, 21; Puri 2015 Dep. 41:2-17. Because no T6 swing was available for Bailey at that time, Puri states that Bailey could not be converted in January 2013. *Id.* 43:22-44:3.

Bailey disputes this. He contends that in January 2013, there were two full-time positions available: Carrier Route 4 and a T6 swing position. PSOF ¶ 22; Bailey Dep. 76:24-77:7. He argues that at that time, Dannie Mamparo had been on leave from his T6 swing position for over a year. PSOF ¶ 22; Pl.'s Resp. Br. at 22-23. Bailey contends that when an employee is out for a year or more, they must relinquish their position. PSOF ¶ 23. So, according to Bailey, Mamparo's T6 swing position should have also been available in January 2013, which in turn means that he and Villareal should have both been converted to full-time carriers at the same time, as Bailey was next in line. PSOF ¶¶ 22-23; Pl.'s Resp. Br. at 23; Seniority List

(listing Villareal right before Bailey). The Postal Service, for its part, disputes much of Bailey's position. The Postal Service asserts that only the Route 4 position was available in January, which went to Villareal. Def.'s Resp. to PSOF ¶ 22. It states that the T6 swing did not become available until later in 2013, and that as soon as it was posted, Villareal dropped the Route 4 position and bid on the T6 swing. *Id.* After Villarreal was awarded the T6 swing, her vacant Route 4 position was posted in September 2013.[21] *Id.*

Bailey's argument here appears to be that Puri and Collins purposely chose not to post Mamparo's T6 swing position knowing full well that Bailey would be next in line for conversion. Pl.'s Resp. Br. at 22-23. Bailey points to a statement Collins made in his deposition in which he said that he likes to post and fill positions as soon as they become available. *Id.* at 23; PSOF ¶ 20; Collins 2015 Dep. 82:24-83:2. He also points to a statement made by Puri in which she said that when an employee provides medical documentation that they need to be out on extended leave for two years, their position gets posted. Pl.'s Resp. Br. at 23; PSOF ¶ 23; Puri 2015 Dep. 38:21-39:1. Bailey argues that these statements show that the Postal

---

[21]Neither party actually states this, but presumably the Route 4 position is also a T6 swing position. Both the Postal Service and Bailey seem to agree that Villareal was converted to a T6 swing position in January 2013. PSOF ¶ 18; Def.'s Resp. to PSOF ¶ 18; Pl.'s Resp. Br. at 22. And Bailey does not appear to contest the Postal Service's position that Villareal was awarded the Route 4 position in January 2013. Indeed, in Bailey's statement of facts, he appears to be asserting that the two full-time positions that were available in January 2013 were the Route 4 position and Mamparo's T6 swing—the latter of which should have gone to him. PSOF ¶ 22. In addition, if the Route 4 position were not a T6 swing, then presumably Bailey would have pointed that out because it would have undermined the Postal Service's reason for not converting Bailey sooner: that in January 2013, a national moratorium was in effect precluding PTF-carriers from being converted to anything other than T6 swing positions.

Service's alleged reason for not converting Bailey sooner—that no T6 swing was available—is a pretext for discrimination. Pl.'s Resp. Br. at 22-23. But these general statements are not enough for a reasonable factfinder to find pretext. There is no evidence that a firm deadline existed for the posting of Mamparo's position. Nor has Bailey provided proper support for his contention that employees on extended leave must relinquish their positions—all he cites is Watson's affidavit, *see* PSOF ¶ 23, and as explained earlier, that affidavit is stricken because of the failure to disclose the subjects of Watson's testimony. Because Mamparo was on medical leave, for which he provided documentation to his supervisors, the Postal Service had a legitimate reason for not posting the position. A reasonable juror could not infer pretext based on these facts.

Bailey separately argues that "it[] [is] questionable as to whether [a] national moratorium even exist[ed]." Pl.'s Resp. Br. at 23. But Bailey fails to present any evidence to cast doubt on Puri's testimony that a moratorium was in place in early 2013. Puri 2015 Dep. 41:2-22. True, no written policy has been offered by the Postal Service, but when it became clear during discovery that the Postal Service intended to rely on this specific policy to support its delay of Bailey's conversion, Bailey could have requested documents reflecting it. Instead, Bailey appears to have waited until *after* the close of discovery to ask for this policy. R. 48, Exh. 8, Sept. 2015 Email String; R. 15, 2/18/15 Minute Entry (setting 08/17/15 as close of fact discovery). So the Postal Service has admissible evidence of the moratorium, PSOF ¶¶ 19, 21; Puri

2015 Dep. 41:2-17, and Bailey cannot simply deny it with no basis. The Court grants summary judgment to the Postal Service on this claim.

### 8. Incident on April 2, 2013

Next, Bailey asserts that he was discriminated against when he was disciplined for delivering certified mail to a customer's mailbox without obtaining a signature. DSOF ¶ 43; Am. Compl. ¶¶ 41-42. Puri stated that she learned about this incident after a customer called the post office to complain. Puri 2014 Second EEO Decl. ¶ 6. She informed Collins of the complaint and Collins issued Bailey a notice of removal, which was reduced to a 14-day suspension by the Dispute Resolution Team. 4/02/13 Notice of Removal; Puri 2014 Second EEO Decl. ¶ 6; Collins 2014 EEO Decl. ¶ 6; 7/19/13 Step B. Decision at 000895.

Bailey asserted during discovery that Al Klebek, who is male and Caucasian, was similarly situated and treated better when Klebek received a 14-day suspension for failing to deliver express mail. DSOF ¶ 70; Pl.'s Suppl. Discovery Resp. Ltr. at 2. Klebek's suspension did not count toward his progressive discipline. *Id.* Bailey noted (again during discovery) that unlike Klebek, his disciplinary violations were never retracted or reduced by management. *Id.* But notably absent from Bailey's summary judgment briefing is any mention of Klebek. *See generally* Pl.'s Resp. Br. Bailey states only that his discipline "was not reduced at the management level … as it had been for other non-African American and for female employees." *Id.* at 24. He does not mention Klebek or challenge the Postal Service's contention that Klebek did not receive different treatment, *see* Def.'s Br. at 17, a

contention which is supported by Klebek and Bailey's receipt of 14-day suspensions for their similar misconduct. Bailey bears the burden of making a prima facie case of discrimination; to do that, he must show that the Postal Service treated a similarly situated individual outside his protected class more favorably. Bailey has failed to do that.

What's more, Bailey has also failed to show that the Postal Service's stated reason for disciplining him was pretextual. Bailey does not present any evidence that would call into question whether the customer who called to complain said something different, nor does he present any evidence to suggest that Puri or Collins did not actually believe the customer. Bailey asserts that the Postal Service keeps a record of customer complaints, and that there is no record of this complaint against him. Pl.'s Resp. Br. at 24. But Bailey provides no support for the contention that there is always a record kept of customer complaints. Bailey cites only to Paragraphs 43 through 45 of the Postal Service's statement of facts—none of which discuss a log sheet for customer complaints. Pl.'s Resp. Br. at 24. Bailey's responses to those statements also fail to discuss any customer complaint log. Pl.'s Resp. to DSOF ¶¶ 43-45. From the Court's own review of the record, the only evidence that could possibly support Bailey's allegation here is Collins's 2015 deposition, in which he states that he believes customer complaints are now tracked, but that he cannot remember when they started logging complaints. Collins 2015 Dep. 102:11-103:24. Collins states it could have been "three or four years" ago, or "possibly two." *Id.* 102:18-19, 103:11-12. All he seems to remember is that "on [his] way out … about a

year-and-a-half [ago,] … it was something that [they] started." *Id.* 103:14-17. So it is possible that a log of customer complaints existed in March 2013. But without more (and especially without Bailey identifying factual support via Local Rule 56.1), this assertion about logged complaints fails to establish pretext.

Bailey separately points to an accountable mail log sheet for March 19, 2013—the day the customer called to complain—which does not list any accountable mail for Route 4. 03/19/13 Accountable Mail Log Sheet. It also does not show the tracking number associated with the certified mail piece listed in Bailey's notice of removal. *Id.*; 4/02/13 Notice of Removal at 005877 (listing tracking no. 7011 2970 0003 6843 2818). But this log sheet, on its own, does not sufficiently cast doubt on the Postal Service's purported reason for the discipline to establish pretext. For one, it is not clear who fills out this log sheet. If the carriers fill it out, then a failure by Bailey to recognize this certified mail piece would explain why it was never logged. The notice of removal also includes very specific details about the complaint, including the time the customer called, the customer's address, and the tracking number of the certified flat mail piece. *Id.* These specifics add detailed support for the Postal Service's stated reason for disciplining Bailey. Puri further stated—on multiple occasions—that she had to go to the customer's home to correct the issue. Puri 2014 Second EEO Decl. ¶ 6; R. 39, Exh. 39, Puri Discovery Dep. 20:5-21:23. Bailey presents no evidence that would suggest Puri did not do this, nor does he present any evidence challenging whether the customer's address was on his assigned route. In fact, he specifically states in his deposition that the customer's

address is on Route 4 and that he was working that route that day. Bailey Dep. 64:15-25. Without more, Bailey has not presented enough evidence to raise a genuine issue of material fact as to whether the Postal Service's alleged reason for issuing him discipline was a fabrication.[22] Accordingly, the Court grants summary judgment to the Postal Service on this claim.

### 9. Inability to Start Work Day Earlier

Finally, Bailey contends that the Postal Service discriminated against him by not allowing him to start his work day thirty minutes earlier, at 7:00 a.m., like two other PTF-carriers, Rosa Villareal (female and Hispanic) and LaTanya Rogers (female and African American). DSOF ¶ 46; Pl.'s Resp. to DSOF ¶ 46; Am. Compl. ¶ 46. Bailey asserts that Rogers was able to receive more overtime wages because she started her day earlier. Pl.'s Resp. to DSOF ¶ 47, Pl.'s Suppl. Discovery Resp. Ltr. at 2; 10/23/14 Final Agency Decision at 002330-2231. Puri explained that she assigned Rogers an earlier start time so that Rogers could case mail on open routes; she also stated that this enabled her to run the office more efficiently and to avoid calling a carrier into work on his or her non-scheduled day at the overtime rate. Puri 2014 EEO Decl. ¶ 12.

---

[22]Bailey suggests in conjunction with this claim that he tried multiple times to escape his "hostile" work environment. Pl.'s Resp. Br. at 24. In his statement of facts, he alleges that his requests to transfer out of the Wood Dale Post Office were denied because of his disciplinary record. PSOF ¶ 30. But to the extent Bailey is trying to assert a claim along these lines, he runs into a problem with the fact that it does not appear that he raised this claim in any of his EEO complaints. *Hill v. Porter*, 352 F.3d 1142, 1145 (7th Cir. 2003) (explaining that a plaintiff may not file suit under Title VII without first exhausting his administrative remedies).

The difficulty for Bailey here is that he does not allege that he ever asked to begin work at 7:00 a.m. So there is no evidence that Puri made a conscious decision against allowing Bailey to start at that time, or that Puri picked Rogers or Villareal over Bailey. Bailey simply suggests that because he was more senior than Rogers, Puri should have approached him first. Pl.'s Resp. Br. at 25. But Bailey offers no evidence showing that Puri should have known that Bailey wanted to start earlier. So Bailey's claim appears to amount to nothing more than a "petty slight[] or minor annoyance[]" with his work hours, which does not qualify as an adverse employment action. *Burlington N. & Santa Fe Ry Co. v. White*, 548 U.S. 53, 68 (2006); *Griffin*, 356 F.3d at 829 (denial of shift change is not an adverse employment action). *Cordoso*, 427 F.3d at 435 (explaining that Title VII does not authorize a court to act as a "'super-personnel department' intervening whenever an employee feels he is being treated unjustly"); *Kaupas*, 2008 WL 624045, at *14.

Bailey also suggests that the earlier start time enabled Rogers to accrue greater overtime. Pl.'s Resp. Br. at 25. But there is evidence in the record—including Bailey's own deposition—showing that all PTF-carriers are entitled to overtime if they work more than forty hours a week, no matter when they begin their shift. Bailey Dep. 8:8-16; Puri 2014 EEO Decl. ¶ 10 ("PTF carriers who start work at 7:00 a.m. are not paid at the overtime rate of pay. Rather, overtime is paid to employees who work more than eight hours."). So it is not necessarily true that starting a shift earlier will automatically translate into greater overtime hours, as Bailey suggests. Here too Bailey fails to show that he suffered any sort of tangible

harm from Puri's decision to allow one or two other employees to begin work earlier. He too would be entitled to overtime if he worked more than eight hours in a day, just as Rogers would be. Bailey has again failed to establish a prima facie case of discrimination, so the Postal Service is again entitled to summary judgment.[23]

## C. Retaliation Claim

Bailey raises one final claim, a retaliation claim. Am. Compl. ¶¶ 73-77 (Count 3). He asserts that the Postal Service retaliated against him for filing his EEO complaints, in violation of Title VII, 42 U.S.C. § 2000e-3(a). *Id.*; *see Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000) ("Title VII protects persons not just from certain forms of job discrimination, but from retaliation for complaining about the types of discrimination it prohibits."). To establish a prima facie case of retaliation, Bailey must show, by a preponderance of the evidence, that he: (1) opposed an unlawful employment practice under Title VII; (2) was the object of a materially adverse action; and (3) that the adverse action was caused by his opposition to the unlawful employment practice. *Hamner v. St. Vincent Hosp. & Health Care Center, Inc.*, 224 F.3d 701, 705 (7th Cir. 2000); *McKenzie v. Ill. Dep't of*

---

[23]It is worth mentioning (even though Bailey does not raise this argument) that even when all of these incidents are considered together, a reasonable factfinder still could not find any differently than the Court did above. Outside of the one incident related to Bailey's work hours on August 25, Bailey fails to provide sufficient evidence to cast doubt on the Postal Service's purported reasons for disciplining him. Bailey is unable to point to others outside his protected class who were treated more favorably than he was, and he is also unable to show that any of the misconduct for which he was disciplined were not matters worthy of discipline. The evidence Bailey offers is simply not sufficient to raise a genuine issue of material fact regarding whether the Postal Service discriminated against him on account of his race or gender.

*Transp.*, 92 F.3d 473, 483 (7th Cir. 1996); *see also Burlington N. & Santa Fe Ry Co.*, 548 U.S. at 67-68.

Bailey runs into several problems here. For one, Bailey fails to sufficiently allege any sort of connection between his protected activity and the supposedly adverse actions taken by the Postal Service. Bailey generally asserts that the Postal Service retaliated against him for filing EEO complaints, Am. Compl. ¶¶ 73-77; Pl.'s Resp. Br. at 26, but he fails to identify which of the alleged incidents of discipline (there are many) were retaliatory and which EEO complaints they were in retaliation for. To prevail on his claim, Bailey must demonstrate a causal link between the allegedly adverse action taken by the Postal Service and his filing of an EEO complaint. *Miller*, 203 F.3d at 1007 (noting that plaintiff must establish "a causal link between the protected expression and the adverse job action"); *see also McKenzie*, 92 F.3d at 483 ("In order to demonstrate the 'causal link,' [the plaintiff] must demonstrate that [the defendant] would not have taken the adverse action 'but for' the protected expression."). Bailey fails to do this.

What's more, even if Bailey had established a prima facie case of retaliation, the Postal Service would still be entitled to summary judgment because, as discussed in-depth in the prior section, the Postal Service offered legitimate, non-discriminatory reasons for its disciplinary actions, and Bailey failed to meet his burden of showing that these reasons were pretextual. *Id.* at 1008. Bailey's only surviving claim relates to the incident on August 25, 2011, where he was sent home early after Puri decided to split his route. But the only EEO complaint Bailey had

filed before that date was filed back in December 2009, almost two years earlier. DSOF ¶ 9; 10/31/13 EEOC Denial of Mot. for Recons. of First EEO Compl. at 001468. So the timing in no way appears suspicious such that it could lend some support to an inference of retaliation. *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (affirming grant of summary judgment where four months had elapsed between employee's protected activity and his discipline). *Cf. Coleman*, 667 F.3d at 861 (holding that evidence of causation was sufficient to withstand summary judgment where adverse actions against employee began around a month after the employee filed EEO discrimination complaints and where employee had also presented evidence of pretext). Nor does there appear to be any evidence of a causal connection between Bailey's protected activity of filing his EEO complaint in 2009 and the Postal Service's alleged materially adverse action of precluding Bailey from working his full shift on August 25, 2011. Because Bailey has failed to properly develop this claim or to raise a genuine issue of material fact as to whether the Postal Service retaliated against him for filing his EEO complaints, the Court grants summary judgment to the Postal Service on this claim.

## IV. Conclusion

For the reasons discussed above, the Postal Service's motion for summary judgment [R.37] is granted as to all but one of Bailey's claims: his claim related to the number of hours he was allowed to work on August 25, 2011. With this summary judgment motion now decided, the parties must seriously engage in

settlement discussions in advance of setting a pretrial conference and trial schedule.

The status hearing scheduled for September 9, 2016, remains in place.


ENTERED:


<u>     s/Edmond E. Chang     </u>
Honorable Edmond E. Chang
United States District Judge

DATE: August 26, 2016